Jessie BALLARD, as Guardian of Betty Lynn Ballard, Appellant,

v.

Delbert BALLARD et al., Appellees.

No. 13053.

Court of Civil Appeals of Texas.

Galveston.

Dec. 6, 1956.

Butler, Binion, Rice & Cook, Robert O. Campbell, Houston, Dillard & Roberts, Clifford S. Dillard, Dallas, for appellant.

Glenn Perry and Irving G. Mulitz, Houston, for appellees.

GANNON, Justice.

Betty Lynn Ballard, a minor, brings this suit through her mother and guardian, Jessie Ballard Saunders, to impress a trust in her favor upon the proceeds of a $13,000 life insurance policy which her deceased father, Harrell C. Ballard, carried with The Equitable Assurance Society of the United States. The defendant in the suit is Delbert Ballard, plaintiff's paternal uncle. Delbert Ballard was designated the beneficiary in the policy and has collected its face amount. He claims the proceeds of the policy as his own, free of any beneficial interest in the plaintiff, Betty Lynn Ballard.

A jury was empaneled to try the cause, but at the conclusion of all the evidence the trial court peremptorily instructed the jury to return a verdict for the defendant, and judgment was rendered accordingly. Betty Lynn appeals.

The minor, Betty Lynn, was born November 29, 1937. Her mother, now by subsequent marriage, Jessie Saunders, was married to her father, Harrell C. Ballard, March 25, 1936. At the time of the marriage the parties were quite young, Harrell C. Ballard being only twenty-two and his wife but eighteen. They resided in Dallas where Harrell Ballard was employed with Butler Bros. at a salary of $50 per month. After the marriage the wife continued her employment as a beauty operator. Betty Lynn was born while the couple continued to reside at Dallas. She is an only child. In 1946 or 1947 the couple moved to Gates-

ville, Ballard having been appointed manager of a retail merchandising establishment controlled by Butler Bros. at that place. Later the couple moved to Mercedes in the Rio Grande Valley, where Ballard took over the management of a Butler Bros. controlled Federated Store there. In November of 1947 the couple separated. Ballard returned to Gatesville to go into business for himself in partnership with one Roy Carpenter, now deceased, and Mrs. Ballard remained at Mercedes, continuing her then employment with Sears Roebuck in nearby Harlingen. At the time Betty Lynn was eleven years of age.

The mother describes the affectionate relationship existing between Ballard and his daughter, Betty Lynn, in these words: "He worshipped the ground she walked on and there was nothing he would not do for her. When he would take a trip he could not think of getting anything done except getting back to her and he always brought her presents, and that attitude continued until the day of his death."

Shortly before the Christmas season of 1947 Ballard called his wife and asked her to bring Betty Lynn to visit with him during Christmas. Ballard was then occupying a rented house in Gatesville. On the arrival of mother and daughter, Harrell Ballard had "many, many presents for her [Betty Lynn], I'd say they numbered about fifteen, and we stayed about three or four days there with him."

On the occasion of this visit, the parties discussed the possibility of a divorce and separation. In the conversation Ballard assured his wife that she had nothing to worry about so far as Betty Lynn was concerned; that she would be taken care of.

After the holidays, Mrs. Ballard and Betty Lynn returned to the Valley, but in January or February of 1948, Betty Lynn was sent to Gatesville to live with her father. She entered school there and remained with her father at Gatesville until his death on July 5, 1948. In the meantime

Mr. and Mrs. Ballard were divorced April 23, 1948. Though the decree granted legal custody of the child to the mother, she nevertheless, by agreement, remained all the while with the father up to the date of his death. Harrell Ballard never remarried. Though self-supporting, Ballard was not a money maker. At his death he left a net estate of only $229.

The $13,000 life insurance policy, the proceeds of which are the subject matter of this case, and another smaller policy with the American National Insurance Company which netted Ballard's estate $141.80, constituted the sole financial protection which Harrell Ballard had provided for his loved ones in the event of his death. Ballard died of a heart attack on a trip to Dallas. The trial court ruled out evidence of his physical condition prior to death, but it is inferable from what did come in that had she been permitted to do so Betty Lynn Ballard could have shown that her father was a long time sufferer from heart disease and more than ordinarily subject to early death from natural causes. We regard this as material.

Mrs. Saunders testified that after her divorce from Harrell Ballard their community property, consisting of an automobile and some furniture, was divided between them by agreement. Also that at the time of the divorce Ballard told her that he was going to substitute his brother, Delbert, as beneficiary of his insurance because he, Harrell, felt that Delbert would see "that Betty Lynn was taken care of." At the time—Mrs. Saunders said—she supposed her husband referred to the small American National Insurance Company policy, she being then unaware that Harrell Ballard had converted his Butler Bros. group coverage with Equitable Assurance Society of the United States to ordinary life on leaving that company's employ.

Shortly after the divorce Ballard wrote his former wife and returned to her a policy of insurance on Mrs. Saunders' life. He had previously told her in a telephone conversation that he would send her the policy

and that she could cash it in or have the beneficiary changed, as she wished. In the same conversation he told her that he was going to substitute his brother, Delbert, as beneficiary of his own policy in place of Mrs. Saunders, feeling that the brother would see that Betty Lynn was taken care of, whereas Mrs. Saunders might marry someone else who would beat her out of it "and he did trust Delbert and knew that he would see that she [Betty Lynn] was taken care of."

Though the brother Delbert acted as administrator of Harrell Ballard's estate, he told Mrs. Saunders nothing of the $13,000 policy in which he was later designated beneficiary. Information concerning the policy came to Mrs. Ballard for the first time several years later and resulted in the institution of this suit.

Other witnesses introduced by plaintiff were Byron McClelland, Elton Sadler and M. C. Carloy. The highlights of their material testimony are:

Byron McClelland testified he was a practicing attorney at Gatesville; that he was employed by Delbert Ballard, who qualified as temporary administrator of the estate of Harrell C. Ballard, to represent the estate. Mr. McClelland testified that he had a conversation with Mr. Delbert Ballard relating to Harrell's life insurance. This occurred sometime in July or August of 1948. Mr. McClelland related the conversation as follows: "Well, Mr. W. Delbert Ballard advised me that Harrell Ballard, the deceased, had left an insurance policy in which he was made beneficiary and I don't recall the amount, and he told me that this policy had been left with him *with instructions that he should take care of Betty Lynn*—Betty Lynn being the daughter of Harrell Ballard, deceased, and that is the reason he told *me* his brother told *him* the reason he left it to him that he did not want Mrs. Jessie Ballard to have the money. (Emphasis supplied). "Q. And he said he left it in trust, was that it? A. No, he did not say he left it in trust—no, he said

he left it with him, with him—left it to him *with instructions for him to take care of Betty Lynn with that money."* (Emphasis supplied.)

Elton Sadler, a close personal friend of the deceased, testified that Harrell Ballard told him he had made his brother, Delbert, the beneficiary under his life insurance policy; that he had talked to Delbert and that he felt that he was the only one he could trust and leave the money to and be assured that *Betty would get it when she needed it.* Deceased also informed Sadler that he had talked the matter over with his brother Delbert.

M. C. Carloy, another close friend, testified that Harrell Ballard was "very, very fond of Betty Lynn"; that Harrell had expressed concern to him for his daughter's future; that this was sometime in the spring of 1948; that the conversation related to an insurance policy, and that Harrell Ballard told him that he had taken out an insurance policy, the exact amount of which witness could not recall. Witness stated that deceased told him that he was very proud of the fact that he had this policy and that he had the policy fixed *so that his daughter Betty Lynn would get benefit from it.*

The record establishes that the policy involved was converted from group insurance to ordinary life January 2, 1948. This was prior to the divorce but after Harrell Ballard had separated from his wife and may explain why the wife was unaware of the policy's existence. Originally Betty Lynn's mother was named as beneficiary. However, about forty-six days after the divorce and on June 9, 1948, deceased changed the beneficiary from his former wife to his brother Delbert. Harrell Ballard died July 5, 1948, twenty-six days after the change of beneficiary.

The defendant, Delbert Ballard, testified in his own behalf. His testimony, material to the trust issue, was as follows: He denied the admission testified to by Mr. Mc-

Clelland. He further denied that he had ever made substantially the same statement to any other party, but he did admit that his brother Harrell discussed the matter with him, Delbert, before he changed the beneficiary in the $13,000 policy. It was Delbert's testimony that his brother Harrell first wrote him a letter about this and later talked to him about it on the telephone. The defendant was not asked to produce the letter, nor was he questioned concerning the details of the telephone conversation with his dead brother. He did not volunteer any information with respect to this telephone conversation, nor did he offer to produce, or produce, the letter. Mr. Ballard said that he never realized—"never really knew" —that he had been made beneficiary of his brother's insurance until after his brother's death when for the first time he was informed of that fact by his brother's partner, Mr. Carpenter. Mr. Ballard denied that anyone had ever told him there was any condition to his receiving the proceeds of the policy, and specifically denied that anyone ever told him that he was to hold the proceeds in trust for his niece, Betty Lynn. The proceeds of the policy were collected by Mr. Ballard in the summer of 1948 and deposited in his checking account at the City National Bank, Houston, Texas. Since that time the funds have been checked out by Mr. Ballard and devoted by him to his own personal uses—for what Mr. Ballard could not remember. Mr. Ballard testified that though a man of modest means he owned his own $16,000 home, subject to a mortgage of $6,000, and another place which he had bought earlier subject to a small mortgage, and now rented at $90 a month. Delbert Ballard is a pipefitter. In 1948 his hourly wage at Johnson Service Company, where he is regularly employed, was $2. As of the time of the trial this rate had increased to $3.45 an hour. Mr. Ballard is married and has two daughters. His annual income in 1955 was in excess of $6,000. Mr. Ballard stated that at death his brother Harrell was not indebted to

him. Mr. Ballard developed no relationship between himself and his deceased brother— or any other fact—which would tend to explain why his deceased brother would have undertaken the payment of premiums on the $13,000 policy for the purpose of providing a fund for Mr. Ballard's benefit to the exclusion of his own infant daughter. He testified that shortly after his brother's death and in August of 1948, the plaintiff Betty Lynn came to live in his home at Houston and remained there until June of 1949. It is inferable that in June of 1949 Mrs. Saunders had remarried and moved with her present husband to Dallas and was then in better position to have the child with her. Mr. Ballard denied that anyone had ever told him that he was to hold the proceeds of the Equitable policy for his niece, Betty Lynn—in fact, he said that he did not know before his brother's death that he was to get any money. He denied specifically and expressly that his dead brother had made any arrangements with him for the distribution of the proceeds of the Equitable policy. Asked if Mrs. Saunders had not inquired of him on several occasions—asked specifically—if Harrell had left any insurance, Mr. Ballard answered, "Yes, but she didn't ask me in those words" and then admitted that he had never told Mrs. Saunders that his brother Harrell had left him $13,000 in insurance.

We will first dispose of appellee's cross-assignment complaining that the testimony of attorney Byron L. McClelland was improperly admitted over an objection based upon a claim of privilege between attorney and client. The record shows that at the time of the conversation to which he testified Byron L. McClelland was representing the estate of Harrell Ballard, deceased, and that he was employed for this purpose by Delbert Ballard; but that is all the record shows material to the claim of privilege. Where and under what circumstances the conversation occurred is not disclosed. There is no proof, direct or circumstantial, which would warrant our as-

suming that it was made while Delbert Ballard was seeking legal advice from Mr. McClelland in a professional capacity, or even that the communication claimed to be privileged was related to any purpose of securing legal advice, or that it was in any way made in confidence by Delbert Ballard to Mr. McClelland. On these points the record is silent. The appellee contends the communication was privileged on the fact, without more, that at the time it was made Delbert Ballard was administrator of his brother's estate and Mr. McClelland was representing him in that capacity.

 Anglo-Saxon public policy underlying the privilege of confidence in communications between attorney and client is to secure the client's subjective freedom of communication. This being the support for the privilege, before a communication to an attorney is protected it must appear that the communication was made by a client seeking legal advice from a lawyer in his capacity as such and the communication must relate to the purpose for which the advice is sought, and the proof, express or by circumstances, must indicate a desire in the client for confidence and secrecy. On these bases of the privilege see Prof. Wigmore's work on Evidence, Vol. 5, page 53, Sec. 2311, 2d Ed., where it is said that the mere fact that a communication is made by a client to an attorney during the course of the relationship raises no presumption of desire for secrecy. We quote: "No express request for secrecy, to be sure, is necessary; but the mere relation of attorney and client does not raise the presumption of confidentiality, and the circumstances are to indicate whether by implication the communication was of a sort intended to be confidential. These circumstances will of course vary in individual cases, and the ruling must therefore depend much on the case in hand." See also McCormick & Ray, Texas Law of Evidence, Second Edition, Sec. 481, page 400, et seq. We quote from Sec. 485, page 406: "The priv-

ilege protects only communications which are made in confidence. Unless it is clear that secrecy was desired the reason for the privilege ceases. While it is not essential that request for secrecy be made neither is there any presumption that *all* communications between attorney and client are confidential." (Emphasis supplied.) In Hayes v. Pennock, Tex.Civ. App., 192 S.W.2d 169, 173, the Beaumont Court said: "Not all statements made by a person to his attorney are privileged communications. To be privileged, the communication must pass between the client and his attorney in professional confidence. 44 Tex.Jur. 1069. Unless it is clear that secrecy was desired the reason for the privilege ceases. 12 Texas Law Review 151, and cases cited. In any given case we must look to the circumstances to determine the intended character of the communication. * * * The desire for secrecy being absent, the reason for privilege also is absent, * * *."

 Appellee having failed to establish the foundation upon which privilege must rest, we rule that the testimony of Mr. McClelland was properly admitted.

 We are also of the opinion that the evidence which we have reviewed entitled plaintiff to go to the jury and that it was error to instruct a verdict for defendant.

 We are unable to find any prohibition against the establishment of trusts in personal property by parol in the Texas Trust Act, Art. 7425b-7, Vernon's Ann.Civ. St. In fact, the proviso expressly requiring that trusts relating to or consisting of *real property* be established by *written instrument* seems to negative any such interdiction. The Restatement of the Law of Trusts, Chapter 2, Section 17, page 67, is clear on the point that a trust in the proceeds of a life insurance policy may be created by a parol direction of the insured to the beneficiary to hold them in trust

where, as here, the policy provides for reserved power in the insured to change the beneficiary. Section 57, Chapter 2, of the same text declares that such a disposition of insurance proceeds is not a testamentary one since a *present* trust is thereby created, the beneficiary taking *his rights as such* in trust, and this independently of an express designation in the policy of the beneficiary as trustee. See also Chapter 3, Sec. 84, page 241 of the same text. Obviously any other doctrine would open a wide avenue to unthinkable fraud.

The stated principles do not run counter to such cases as Garabrant v. Burns, 130 Tex. 518, 111 S.W.2d 1100; and Olivares v. Olivares, Tex.Civ.App., 170 S.W.2d 575; which are governed by strictly legal, as contra-distinguished from equitable, principles. In fact, these principles appear to synopsize rules to be deduced from such cases as Dunn v. Second National Bank of Houston, 131 Tex. 198, 113 S.W.2d 165, 115 A.L.R. 730; Eaton v. Husted, 141 Tex. 349, 172 S.W.2d 493, and cases from other states, which, being expressly cited with approval by our Supreme Court in Dunn v. Second National Bank of Houston, supra, have strong if not conclusive force as Texas authority. See Hart v. Traders & General Insurance Co., 144 Tex. 146, 189 S.W.2d 493, stating that cases which have the approval of the Supreme Court must be considered authoritative.

In Garabrant v. Burns, supra, an abortive effort at change of the beneficiary of a life insurance certificate issued by a fraternal organization—the effort being short of contractual requirements contained in the constitution and by-laws of the association—was held ineffective. The court based its decision on two theories: (1) that to permit a change of beneficiary, other than in compliance with the provisions of the contract, would tend to fritter away insurance funds in expensive and uncertain litigation, to the detriment of widows, orphans and heirs, and (2) because the

right of the beneficiary to have the contract carried out in the manner provided for in the contract is as binding *upon the member* as *his right* to change the beneficiary is binding upon the beneficiary and the society—the court holding that the interest of a beneficiary, though a mere expectancy during the continuation of the power of revocation of the appointment during the life of the insured, *becomes upon the death of the insured an absolute and vested right* unless the insured "has, in the manner prescribed, defeated it by the affirmative act of changing the beneficiary."

In the Olivares case these principles were held to constitute a barrier to the enforcement of an *executory contract* between the insured and the plaintiff in that case, by which the plaintiff claimed that the insured, on a valid consideration, had agreed to name him beneficiary of the policy there involved. The court said—referring to the plaintiff who was insured's brother—: "Appellee contends, however, that here we have a parol trust and that no parol trust was involved in the Garabrant-Burns case. The effect of that holding cannot be circumvented simply *by calling the agreement* between the insured and his brother *a parol trust* engrafted upon the policy." [170 S.W.2d 576.] It is evident that in the Olivares case the court did not feel it was confronted with a trust situation, so that the second ground of its decision, based upon lack of consent of the beneficiary to act as trustee, is dicta. We consider this dicta to be contrary to a decision of our Supreme Court, to which we shall refer. Nevertheless, we think that the evidence in the present record is sufficient to authorize a finding that during the lifetime of Harrell Ballard, his brother Delbert consented and agreed to act as trustee. Delbert Ballard stated to Byron McClelland that the subject policy "had been left with him *with instructions* that he should take care of Betty Lynn." It is easily inferable from this that if Delbert

Ballard had refused to act as trustee or had indicated to his dead brother his intention to claim the proceeds of the policy as his own, Harrell Ballard would have changed the beneficiary to some other person.

In Dunn v. Second National Bank of Houston, supra [131 Tex. 198, 113 S.W.2d 171], in an opinion adopted by the Court, Judge Smedley said: "It is settled by the decisions in this state and by the weight of authority in other states that a trust may be impressed upon a life insurance policy or upon the proceeds of a life insurance policy in the hands of a named beneficiary *and that proof of such trust may be made by parol.*" (Emphasis supplied.) Cited in support of this statement are the following cases: Hughes v. Jackson, 125 Tex. 130, 81 S.W.2d 656; Jackson v. Hughes, Tex.Civ.App., 52 S.W.2d 687; Clausen v. Jones, 18 Tex.Civ.App. 376, 45 S.W. 183; Rape v. Gardner, Tex. Civ.App., 54 S.W.2d 594; Donithen v. Independent Order of Foresters, 209 Pa. 170, 58 A. 142; American Life & Health Insurance Co. v. Robertshaw, 26 Pa. 189; Crews v. Crews' Administrator, 113 Ky. 152, 67 S.W. 276; Kerr v. Crane, 212 Mass. 224, 98 N.E. 783, 40 L.R.A.,N.S., 692. Later in the opinion it is announced: "Notice to the trustee, however, is not one of the elements essential to the creation of a parol trust." Cited in support of this holding are Clausen v. Jones and Donithen v. Independent Order of Foresters, supra, Perry on Trusts, 6th Edition, Vol. 1, Sec. 105, page 137, and Restatement of the Law of Trusts, Vol. 1, Sec. 24, Subsection c, pages 75, 76; Sec. 35, pp. 113, 114.

If what is said in Dunn v. Second National Bank of Houston is contrary to anything said in Garabrant v. Burns, then the Dunn case, which is later in point of time, controls. However, rightly understood, we see no conflict between the two cases. Nor apparently does the Court itself, which decided both. In Eaton v. Husted, supra [141 Tex. 349, 172 S.W.2d 497], in an opinion by Judge Brewster, which the Court adopted, the Court said of the trial court's judgment which had impressed a parol trust on the proceeds of an insurance policy made unqualifiedly payable to one George Eaton: "We think this testimony, considered in connection with the fact that George Eaton, Jr., was made beneficiary in the policy at about the same time that the two deeds and the bill of sale were executed to him, was some evidence that Lou Eaton intended that the proceeds of the policy should constitute a part of the trust funds and that George Eaton accepted it as trustee, and that, therefore, we would not be warranted in disturbing the jury's verdict on that issue. That the insured could thus impress a trust upon the proceeds of the policy in the hands of George Eaton, proof of which could rest in parol, was definitely settled in Dunn v. Second National Bank of Houston, 131 Tex. 198, 113 S.W.2d 165, 115 A.L.R. 730."

The holdings in the cases cited by the court in Dunn v. Second National Bank of Houston, supra, one or more, appear to undermine every basis upon which appellee Delbert Ballard relies to sustain the action of the trial court in instructing a verdict in his favor.

In Kerr v. Crane, supra [212 Mass. 224, 98 N.E. 784], it is held that a parol trust in the proceeds of a life insurance policy is not testamentary in character; that no consideration is required to sustain such a trust other than that the beneficiary retains his position as trustee by reason of his undertaking and that "it would be a fraud for him [the beneficiary] to receive and apply to his own use the proceeds which he has been enabled to obtain only by means of his promise to pay them to the plaintiff." In Hughes v. Jackson, supra [125 Tex. 130, 81 S.W.2d 657], our Supreme Court found certainty of trust in-

tent and sufficient definiteness in trust terms in an arrangement whereby the beneficiary undertook to collect the proceeds of a policy and use them for the "general welfare" of the insured's children " 'in any manner he [the beneficiary] might see fit.' " And, in Donithen v. Independent Order of Foresters, supra, the Supreme Court of Pennsylvania upheld a parol trust in the proceeds of life insurance as against the personal claims of a named beneficiary on evidence which, in principle, is indistinguishable from the testimony upon which Betty Lynn relies for the enforcement of her claims here. As to the necessity of agreement on the part of the beneficiary to act as trustee, or even that the beneficiary know that he had been named as such, the Pennsylvania court said [209 Pa. 170, 58 A. 143]: "To establish the truth it was not necessary that Frederick [the insured] should have communicated with his brother Lloyd and obtained his consent to act before naming him in the certificate. When the latter, after his brother's death, learned the fact, he could have declined to accept the duties of trustee; but, on learning the intent of his brother in naming him, he was bound, in common honesty, to say nothing about fraternal duty, to faithfully carry out the intention of his dead brother." As we have stated, the material facts in the Donithen case are strikingly similar to those in the present record. There the Supreme Court of Pennsylvania reversed a decision of the trial court refusing to establish the trust contended for, the trial court having held the evidence was "too vague and shadowy to establish it." After first pointing out the *complete naturalness* of the trust there claimed to exist in favor of a young wife, the Pennsylvania Supreme Court said of the beneficiary's personal claim—he being an older brother living in another state, with whom the insured rarely communicated and being in prosperous circumstances —"Was it probable that the thoughts of

this young husband, engaged in a hazardous employment, would turn to making a money provision for this brother—would prompt him to take upon himself the annual burden of payment of dues on a $1,000 certificate the remainder of his life for the sole benefit of this brother, who was not necessitous, to the exclusion of his young wife, who he knew in case of his death would be? He does not even inform the brother that he had named him as beneficiary in the certificate. Lloyd Donithen did not know this fact until after his brother's death. * * *."

When one considers the affectionate relationship existing between Harrell Ballard and Betty Lynn, the youth and helplessness of the latter, the fact that Delbert Ballard was well able to take care of himself and his own family, and the unnaturalness and anomaly—bordering on the bizarre—inherent in the notion that Harrell Ballard would undertake the payment of premiums on the $13,000 policy for the benefit of his older brother to the exclusion of his eleven year old daughter for whose well-being he was so solicitous, it seems to us that one is pointed unerringly to the existence of a trust in the proceeds of the policy for the benefit of the daughter. If not, then surely it takes but slight supplementary evidence to support findings which would place the matter beyond doubt.

Here we have proof of an admission by Delbert that his brother left the proceeds of the policy to him "with *instructions* for him to take care of Betty Lynn with that money." Additionally, trust intent is supported by numerous declarations of the insured in his lifetime—declarations which are normal and natural to any father. These declarations clearly indicate that Harrell Ballard had in mind a living, active trust for the general welfare of his daughter; or, if not an active trust, then at the very least, a naked, dry or passive one

for the collection of the policy proceeds for the benefit of his daughter.

We do not have the slightest doubt of the admissibility, under this record, of the insured's declarations. In fact, appellee Delbert Ballard does not question their admissibility, but only their sufficiency to establish trust intent. If, however, they are not, in and of themselves, competent, standing alone, to establish the parol trust here contended for, they are clearly admissible and competent to corroborate and bolster up Delbert Ballard's own admission, testified to by Mr. McClelland, that he had collected the proceeds of the policy under instructions from his dead brother "to take care of Betty Lynn with that money." Cases involving declarations by an insured in a policy which does not reserve to the insured the right to change the beneficiary and made *after the vesting of rights* in the beneficiary are not analogous. Where, as stated in the text of McCormick & Ray, Texas Law of Evidence, 2d Edition, Sec. 1176, "the insured has reserved the right to change the beneficiary or if the beneficiary's right is otherwise contingent" most courts admit such declarations on the theory of privity of title between the insured and beneficiary. Addressing itself to the argument that declarations of the insured should not be received against the beneficiary because the beneficiary does not take *under or from the insured,* the quoted text proceeds: "It is submitted that this argument stresses technical privity to the sacrifice of fairness and common sense." We agree. In Clausen v. Jones, supra, this Court apparently held a single declaration of an insured competent alone to engraft a trust on the proceeds of a life insurance policy. See also Lord v. New York Life Ins. Co., 95 Tex. 216, 66 S.W. 290, 56 L.R.A. 596.

We are of the strong opinion that appellant's evidence is legally sufficient to sustain findings to support her claim of an exclusive beneficial interest in the proceeds of the policy here involved.

The several cases cited by appellee ruling the insufficiency of transactions said to constitute gifts inter vivos are not applicable to this record. We are not here dealing with gifts of personal property inter vivos. The validity of these, of course, depends upon delivery, actual, constructive, or symbolic. This record shows a present trust created in his lifetime by Harrell Ballard with a trustor, trustee and a trust res. Equity will not allow the fact that Harrell Ballard during his life had power to revoke the trust to result in a windfall and unjust enrichment for Delbert Ballard. Assuming the truth of appellant's evidence, no principle of justice or right reason would allow Delbert to be heard to question the fiduciary role in which he acted in collecting the proceeds of the policy.

Lastly we come to appellee's contention that appellant's evidence is not of that clear, satisfactory, and convincing quality which equity requires before it will exercise jurisdiction. The decisions in our State on what constitutes clear and satisfactory evidence are themselves neither clear nor satisfactory. One of our intermediate appellate courts has stated that in Texas only a preponderance of the evidence is required to engraft a parol trust. The same court in a later opinion, speaking through another justice, reverts to the ancient equitable requirement that the evidence be clear, satisfactory and convincing. We have concluded that under our blended system, in a jury case such as this, it is required that the court consider the evidence viewed in its most favorable light from the standpoint of plaintiff to be clear, satisfactory and convincing before the issue may be submitted to a jury, but that jury findings themselves may rest only upon the preponderance of the evidence. See 42 Tex.Jur., Trusts, Section 76, page 688,

stating: "It is not necessary that the evidence in support of a trust should stand uncontradicted; a preponderance is sufficient, provided that the evidence supporting the trust is satisfactory in quality and credibility. The question, it has been said, is not whether the trust was established by a particular amount of evidence, but does the supporting evidence make it *reasonably clear and certain* that an oral trust was created?" (Emphasis supplied.) This perhaps is as accurate a statement of the true rule as can be found. We hold that plaintiff's evidence is reasonably clear and certain. Obviously it is neither vague nor shadowy.

The case will be reversed and remanded to the trial court. For the consideration of the parties and the court on a retrial, we call attention to the following: (a) Plaintiff's trial pleadings allege primarily the existence of a naked, dry or passive trust. While there may be some evidence which would support such a finding, it is reasonably clear to us that if the testator had a trust in mind, it was an active one. See Hughes v. Jackson, supra. (b) If on proper findings the trial court should decree the existence of an active trust, it will be necessary for a substitute trustee to be appointed. This we think should be covered by the pleadings. (c) It seems to us that in the interest of orderly procedure the effort to *construct a* trust *upon properties of the defendant* based upon the claim of conversion to his own use of trust assets should be severed from that part of the case by which it is sought firstly to establish the existence of a trust. Should another trial result in an express parol trust being established, then a substitute trustee may be appointed and such substitute trustee can intervene in the severed proceeding and prosecute same to judgment.

Reversed and remanded.

CODY, J., not sitting.