James Christopher DUNCAN, by his Next Friend, Sheila Jo DUNCAN, Kristy Lynn Duncan, by her Next Friend, Sheila Jo Duncan, and Sheila Jo Duncan, Plaintiffs–Appellants,

v.

Douglas Floyd DUNCAN, Defendant–Respondent.

No. 19126.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 3, 1994.

Hugh C. Harvey, Marshall, for appellants.

Ralph W. Muxlow II, Richland, for respondent.

CROW, Judge.

Sheila Jo Duncan ("Sheila") is the (1) widow of James William Duncan ("James"), and (2) mother of their two minor children, James Christopher Duncan and Kristy Lynn Duncan. When James died, he owned two life insurance policies, the proceeds of which were paid to his brother, Douglas Floyd Duncan ("Defendant").

Sheila and the two children, henceforth referred to collectively as "Plaintiffs," brought this action against Defendant seeking a declaration that he holds the insurance proceeds as trustee for Plaintiffs. Defendant moved for summary judgment. The trial court granted the motion. Plaintiffs appeal.

The record and briefs [1] establish that Sheila and James married in 1976. Their children were born in 1980 and 1983, respectively. Sheila and James separated about April 13, 1991, but the marriage was never dissolved.

When they separated, James owned a $60,000 life insurance policy issued by Fidelity Union Life Insurance Company in which he was the insured and Sheila was the beneficiary. On May 11, 1991, James executed a "Change in Beneficiary Designation" naming Defendant primary beneficiary of the policy.

On June 19, 1991, James purchased a $100,000 life insurance policy from First Colony Life Insurance Company in which he was the insured and Defendant was the beneficiary.

On September 15, 1991, a Marshall, Missouri, police officer was dispatched to a motel in that city because the manager was unable to awaken a man in one of the rooms. The officer entered the room and discovered the unconscious man was James. The officer found two empty pill bottles, two spiral notebooks, and a piece of paper.

James was taken to a hospital in Marshall and later to a hospital in Columbia, where he died September 29, 1991.

There was handwriting in the notebooks and on the piece of paper found with James. Sheila identified the writing as James'.

The writing on the piece of paper read:
"My Wife is
Sheila Jo Duncan
1511 S. Benton
886–8162
Tell her I Love her"

The writing in one of the notebooks read, in pertinent part:

---

1. Where a statement of fact is asserted in one party's brief and conceded to be true in the adversary's brief, we may consider it as though it appears in the record. *Nastasio v. Cinnamon*, 295 S.W.2d 117, 119[1] (Mo.1956); *Thornbury v. Morris Oil Company, Inc.*, 846 S.W.2d 238, 239[1] n. 2 (Mo.App.S.D.1993).

"Last Will and Testament
for
James William Duncan

. . . .

I request my brother—Douglas Floyd Duncan to be the executer [sic] of my estate (Insurance Polices), and he act as controller of the monies along with my Dad's advice on Investments.

I have two Life Insurance policies, one from Fidelity Union Life ... in the amount of $60,000.00. The second from First Colony Life in the Amount of $100,-000.00....

Disbursement of Funds:

1st Option and the one I want—Pay Sheila Jo Duncan $500.00 @ month with a cost-of-Living increase of 7% a year for 7 years. At that time it would have grown to $750.00 @ month. When James Christopher Duncan reachs [sic] age 18 at that time cut that amount in half, and start the 7% process again until Kristy reachs [sic] age 18. And the balance of the money be put in a college fund for Jimmy and Kristy to share equally. Also, If Sheila where [sic] to remarry these monies stop and are put in for the kids college.

Option # 2 would be the same but the Initial monthly amount starts at $400.00, but the rest of the process works the same.

The only reason Option 1 wouldn't work is if First Colony didn't pay off. And because it might be within the two (2) year incontestability period they will try not to pay off. However, my Intentions of starting that policy were that with my health problem getting worse—I better get a policy while I can. That is in my handwriting, so take them to court if you have too [sic].

Doug, I owe Mom and Dad $2,000.00 please pay that, and $2,000.00 for you & Bobbi for all the Grief of the bookeeping [sic] and Investments. Also, In my Briefcase are bills Due that need to be completely paid off.

I ask you to do this *for me*, and always act in a professional matter. I want no problems given to Sheila, or the kids. Like you promised me.

A matter I overlooked is I want this account to help out the kids financially. Like Down payment on a car for them, and a Christmas present each year.

I the Undersigned,
James W. Duncan

... ”

For convenience, we henceforth refer to the above document as "the unwitnessed will."

The first of Plaintiffs' three points relied on asserts the trial court erred in entering summary judgment for Defendant in that James, by the unwitnessed will, established an express inter vivos trust for Plaintiffs' benefit, the trust corpus being the $160,000 insurance proceeds.

■ As we understand Plaintiffs, they do not contend the unwitnessed will meets the requirements for a valid will, hence they do not argue James created a testamentary trust. Accordingly, we begin our consideration of Plaintiffs' first point by examining Missouri law to ascertain whether it allows an insured to create an inter vivos trust where the corpus is to consist solely of life insurance proceeds which will not be delivered to the trustee until after the insured's death.

In *Rosenblum v. Gibbons*, 685 S.W.2d 924 (Mo.App.E.D.1984), a settlor executed a trust indenture reciting he had caused his interest in a retirement and family protection plan to be made payable to a trustee, and that this, along with one dollar and "other valuable considerations," constituted the consideration for creation of the trust. After the settlor's death, his children maintained the trust was invalid in that the corpus consisted solely of retirement benefits which were not to be received until the settlor's death before retirement, that actual delivery was occasioned by his death, and therefore the trust was testamentary rather than inter vivos. *Id.* at 927. Secondly, the children asserted that the designation of the trustee as beneficiary was not a conveyance or assignment, as it vested no title in him but created a mere expectancy. *Id.*

The Eastern District of this Court rejected the attack and held the settlor created a valid inter vivos trust. *Id.* at 928–29. In so holding, the Court noted that after the settlor's death (in 1982), the General Assembly of Missouri (in 1983) enacted what is now § 456.030, RSMo 1986, which recognizes the growing use of life insurance trusts. *Rosenblum,* 685 S.W.2d at 929 n. 1.

Section 456.030 reads:

"Proceeds of life insurance policies heretofore made payable to a trustee ... named as beneficiary or hereafter to be named beneficiary under an inter vivos trust shall be paid directly to the trustee ... and held and disposed of by the trustee ... as provided in the trust agreement or declaration of trust in writing made and in existence on the date of death of the insured, whether or not such trust or declaration of trust is amendable or revocable or both, ... and notwithstanding the reservation of any or all rights of ownership under the insurance policy ...; subject, however, to a valid assignment of any part of the proceeds. It is not necessary to the validity of such trust agreement or declaration of trust that it be funded or have a corpus other than the right, which need not be irrevocable, of the trustee ... named therein to receive such proceeds as beneficiary. ..."

*Rosenblum* relied on a passage from Scott on Trusts, 3rd ed., vol. 1, § 57.3 (1967), concerning trusts funded solely by life insurance proceeds. The passage from Scott stated, among other things, that although the rights of the beneficiaries of such trusts are enjoyable only after the death of the insured, and the trustee has no active duties until the insured's death, those circumstances do not prevent an inter vivos trust from arising when the trust indenture is signed and the trustee is designated as beneficiary of the insurance policy. 685 S.W.2d at 928. This is so even where the settlor has reserved the right to change the beneficiary of the policy and the beneficiaries of the trust. *Id.*

*Rosenblum,* coupled with § 456.030, establishes that at the time James signed the unwitnessed will, Missouri law authorized creation of an inter vivos trust with a corpus to consist solely of life insurance proceeds payable to the trustee upon the insured's death.

The next issue is whether the steps taken by James were sufficient, under Missouri law, to create such a trust.

Defendant concedes an express inter vivos trust can be created in personal property, but cautions us that the settlor's intent to create one must be shown by evidence which is clear and explicit, leaving no room for a reasonable doubt that a trust was intended. *Forester v. Bellville,* 513 S.W.2d 726, 729[3] (Mo.App.1974). There, the court held:

"No particular words are required to establish a trust but the intent to create one 'must be clearly expressed by words or conduct or both' and the evidence must be so cogent, clear and convincing as to dispel any doubt in the Court's mind."

*Id.* at 729[5].

Although not factually identical, *Forester* is similar to the instant case in some respects. There, a man and a woman became engaged in December, 1969. He bought a life insurance policy in January, 1970, listing his mother as beneficiary. The man married his fiance in March, 1970. They had a child in November, 1970. The man was killed a year later. The wife claimed the policy proceeds on the theory that her husband created an express trust therein for her benefit. *Id.* at 728. The trial court found for the wife.

The appellate court noted evidence that after the marriage, the insurance agent talked to the husband about changing the beneficiary to his wife. The husband replied, "Mom will take care of that." *Id.* at 728. There was no evidence that the husband's mother was aware she was the beneficiary until after her son's death; she denied she was so aware. *Id.* There was evidence that the husband had told his wife's parents about the insurance, saying it would take care of her and the baby. *Id.* Additionally, there was evidence that after the husband's death, the wife and her parents told the husband's mother she (the mother) was the beneficiary. The husband's mother thereupon replied: "... don't worry, I will sign [it] over" or

"there would not be any problem, she would sign it over to her."

The appellate court held it was unable to find the evidence sufficient to support an express trust. *Id.* at 729. The court explained there was no evidence that the husband ever declared the insurance proceeds to be in trust, and no evidence as to when the trust was created, what constituted its res, or what enforceable duties were imposed. *Id.* The court found the husband's statement to the insurance agent was not a clear expression and grant of a definite beneficial estate or interest to the wife, but was at most ambiguous. *Id.* The court could not conclude that the husband's conversation with the wife's parents established the requisite intention to create a trust. *Id.* Accordingly, the court held the husband's mother was entitled to the policy proceeds.

Although no trust was recognized in *Forester,* the opinion tacitly acknowledged that Missouri law (in 1974) authorized creation of an inter vivos trust with a corpus to consist solely of life insurance proceeds payable to the trustee upon the insured settlor's death. Had Missouri law forbade such a trust, *Forester* could simply have said so, thereby eliminating the chore of examining the sufficiency of the evidence.

■ In stark contrast to *Forester,* the facts in the instant case bespeak an unmistakable intent by James to create a trust, the corpus being the proceeds of the two life insurance policies. The unwitnessed will: (a) identifies each policy by company and amount, (b) asks Defendant to be "controller" of the money and to seek investment advice from James' father, (c) names the beneficiaries of the trust, (d) sets forth detailed instructions for disbursement of funds, including annual increases, (e) contains directions to follow when each child reaches age 18, (f) covers the possibility that litigation against one of the insurance companies may be necessary to obtain the proceeds, (g) provides for $2,000 compensation to Defendant for bookkeeping and investments, and (h) implores Defendant to carry out the duties in a professional way "[l]ike you promised me."

■ Mindful of the rule that evidence to establish a trust must be cogent, clear and convincing, and that ordinarily it should dispel all doubt, *Gardner v. Bernard,* 401 S.W.2d 415, 423[18] (Mo.1966), we hold the evidence here satisfies that requirement and compellingly demonstrates James intended to create a trust funded by the insurance proceeds.

That holding, however, does not resolve all the issues. Defendant argues there is no evidence establishing when James wrote the unwitnessed will. Although that is true, the record supports an inference that James wrote it shortly before he and it were found at the motel. That inference is strengthened by a postscript on the unwitnessed will stating, in part: "... I don't want to lay in the Hosp. in a coma—Three days Maximum."

■ Defendant fails to explain why it is essential to determine the date James wrote the unwitnessed will, and cites no case holding that inability to do so is fatal to the intended trust. We have found no such case.

■ Defendant also asserts there is no evidence that he agreed to perform any trustee duties. Defendant directs us to an affidavit he filed in support of his motion for summary judgment. In the affidavit, Defendant declared he had no agreement with anyone to create a trust for the benefit of Plaintiffs, that no terms of such a trust were ever conveyed to him, and he never accepted any obligation as trustee of any such trust. In that connection, we note the change of beneficiary form regarding the $60,000 policy did not designate Defendant as trustee, and the $100,000 policy does not designate him as trustee.

Defendant, as we understand him, maintains the factors in the preceding paragraph defeat the intended trust. IA Scott, The Law of Trusts, § 57.3, p. 159 (4th ed., Fratcher 1987) states:

"There is not entire agreement on the question whether an intended trust fails where the policy is payable to a beneficiary absolutely and the insured, although he intends that the beneficiary shall hold the policy and its proceeds in trust, does not

communicate his intention to the beneficiary."

A case upholding an intended trust in such circumstances is *Carter v. Carter*, 321 Pa. 391, 184 A. 78 (1936). There, Thomas Carter had a son by his first wife, and in 1922 bought two life insurance policies naming her as beneficiary. In 1925, Thomas married one Natalie. On July 31, 1928, Thomas made the policies payable to his son. On the same day, Thomas composed a letter to his son stating he (Thomas) had made the changes to avoid the delay inherent in probate and to save inheritance tax. The letter continued:

"I have ... named you and wish you to act as trustee to distribute whatever amount is receivable.

As the insurance stands at the present moment there would be about $18,000 to collect—of this amount you are, to retain $3,000—to give Natalie $5,000 and transmit the remainder to your mother...."

The letter was found among Thomas' effects after he died in 1932. It was in an envelope endorsed: "Only to be delivered in case of death of Thomas Carter." The son had no knowledge of the letter until it was found, and no knowledge of his designation as beneficiary of the policies until then. After receiving the letter, the son collected the insurance proceeds, but refused to pay Natalie. She sued. The trial court entered judgment for her for $5,000 plus interest. The son appealed.

The Supreme Court of Pennsylvania affirmed, stating:

"There can be no doubt that the legal effect of this arrangement was to create a trust. The transfer to [the son] of the interest in the policies was under and subject to the conditions of the letter, by which the [son] was constituted the trustee of specified trust property for named beneficiaries. The settlor had the unquestioned power of disposal of the funds to be received from his insurance policies, and his letter discloses a clear intention and determined purpose to place these funds in the hands of his chosen fiduciary, in whom he had confidence, for the declared object of insuring prompt distribution to the particular persons he designated.

. . . .

It was not necessary under the circumstances to have notified the trustee and obtained his consent to act before designating him as such in the policies. Having accepted the trust, which he might have disclaimed, it was the duty of the [son] to administer it, and to carry out its provisions in obedience to the instructions of his father; he may not now be heard to set up an interest in the trust property adverse to that of the beneficiary, or to deny the validity of the trust under which his title to the fund in question is derived."

184 A. at 79–80 (citations omitted).

Intended trusts of life insurance proceeds have been upheld in analogous circumstances: *In re Koziell's Trust*, 412 Pa. 348, 194 A.2d 230 (1963); *Ballard v. Ballard*, 296 S.W.2d 811 (Tex.Civ.App.1956).

The only noteworthy difference between *Carter* and the instant case is that here, Defendant maintains there are "no credible facts" which suggest he knew about the unwitnessed will before he collected the insurance proceeds. However, it is equally true that nothing in the record establishes Defendant did not know about the unwitnessed will before collecting the proceeds.

Inasmuch as this is an appeal from a summary judgment, we review the record in the light most favorable to Plaintiffs, the parties against whom judgment was entered. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376[1] (Mo. banc 1993). The record includes the paragraph of the unwitnessed will which asks Defendant to carry out James' directives "[l]ike you promised me." Viewed favorably to Plaintiffs, the record does not compel a finding that Defendant was unaware of the unwitnessed will when he collected the insurance proceeds.

*Carter*, 184 A. at 80, *Koziell's Trust*, 194 A.2d at 232[2], and *Ballard*, 296 S.W.2d at 818[7], hold an inter vivos trust can be created in life insurance proceeds without informing the trustee prior to the insured settlor's death. Finding those cases persuasive, we

hold that even if Defendant was unaware of the intended trust when James died, it was error to enter judgment for Defendant.

We further hold there is no genuine dispute as to any fact material to whether James created an express inter vivos trust in the $160,000 life insurance proceeds, and that the record establishes as a matter of law that he did. That determination makes it unnecessary to address Plaintiffs' second and third points.

It follows that the judgment must be reversed and the cause remanded to the trial court with a directive to declare Defendant trustee for Plaintiffs of a trust consisting of the proceeds of the life insurance policies identified in the fourth and fifth paragraphs of this opinion. However, that will not end the trial court's role.

The relief prayed for by Plaintiffs included an accounting to determine the amount of the present corpus and accumulated income, appointment of a master to determine the amount in the trust fund and to take proof and determine the respective interests of all parties, framing a proper plan of distribution and apportionment of the trust fund to Plaintiffs, appointment of a receiver to prevent "any further dissipation and waste of said trust fund," and other relief.

Determining precisely what relief is warranted, how to structure it, and the amount of money Defendant is accountable for, will require presentation of evidence and perhaps resolution of credibility issues. As to Defendant's accountability, the trial court may find guidance in *Perry v. Perry*, 484 S.W.2d 257 (Mo.1972).

The judgment is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.

PREWITT and PARRISH, JJ., concur.