# HERBERT EATON ET AL V. LEE DELL HUSTED ET AL.

No. 8045.  Decided May 26, 1943.
Rehearing overruled July 14, 1943.
(172 S. W., 2d Series, 493.)

*Brachfield & Wolfe, Frank C. Bolton* and *Gordon R. Wellborn*, all of Henderson, *M. H. Barton*, of Overton, *Joseph A. Seymour*, of Midland, and *Black, Graves & Stayton*, of Austin, for petitioners.

The evidence upon which respondents relied is insufficient as a matter of law to sustain the jury's findings that George Eaton used trust funds when he purchased certain property in consideration of a wagon and team plus either $130.00 or $230.00 in cash and vendor's lien notes executed by him amounting to $520.00, because under the terms of the alleged trust agreement, George Eaton, Jr., was to take the property and manage and control it as his own, and there could be no commingling of funds involved. Furthermore, there was no evidence that this property was paid for out of a fund that contained any commingled trust funds. Continental Natl. Bank of New York v. Weems, 69 Texas 489, 6 S. W. 802; Tyler

County Bank v. Shivers, 6 S. W. (2d) 108; King v. Gilleland, 60 Texas 271.

*J. V. Fleming, Clower & Wilson* and *Potter & Bezoni,* all of Tyler, for respondents.

The evidence was sufficient as a matter of law to impose a trust upon the conveyances, bill of sale and insurance policies that were delivered by Lou V. Eaton to George W. Eaton, Jr. Smalley v. Payne, 130 S. W. 739; Spencer v. Pettit, 34 S. W. (2d) 798; Neyland v. Bendy, 69 Texas 711.

MR. JUDGE BREWSTER, of the Commission of Appeals, delivered the opinion for the Court.

This is a suit to impress a parol trust upon real estate.

At her home, in Lahunda, California, on March 18, 1937, Mrs. Lee Dell Husted heard a radio news flash of the tragic explosion of the schoolhouse at London, Texas. This stirred memories of an unhappy childhood. She had been born at London, in 1902, to an unwed mother, who had died two years later when but nineteen years of age. That had left Lee Dell with but one friend, her grandmother, a widow, who was old and feeble and so decrepit that she could hardly move about the house. Not only the community at large but their own kin as well, except one uncle, had scorned Lee Dell and her mother and had shunned the grandmother's home because it sheltered them.

Finally, the grandmother had become so helpless that, in December, 1907, a family conference had been called to determine what to do for her. George Eaton, Jr., Lee Dell's uncle, had agreed to take the grandmother into his home, but he would not take Lee Dell because he did not want his children to associate with her. But Mrs. Mary Ann Shaw, her mother's half sister, had consented to take Lee Dell. So she and her grandmother had separated, and the latter had died a few months lated. When she went to live with Mrs. Shaw, Lee Dell had taken all her effects, consisting of an old wardrobe, a feather bed, two or three "dirty old quilts," a spinning wheel, a few toys and two or three rings and a set of ear screws, which had been worn by her mother.

When she was fifteen years old, Lee Dell had gone to Dallas to the home of a cousin, and had remained there nearly three years. Then she had gone to New Orleans, where she married

in 1922. Thereafter she had entirely lost contract with her mother's family.

Despite these memories, Lee Dell was moved to find out about her kin, to determine whether any of them had been injured or killed in the schoolhouse explosion. She wrote the sheriff of Rusk County and in response thereto received a letter from a cousin. What she thereafter learned resulted in this suit, filed January 22, 1941.

The petition alleged that Mrs. Husted was a granddaughter of George W. Eaton, Sr., and Lou V. Eaton; that both were dead; that they left a number of heirs, among whom was George W. Eaton, Jr.; that the latter died in 1937, leaving a group of heirs, whom she joined as defendants and who are designated as Herbert Eaton, et al, petitioners here; that upon the death of George W. Eaton, Sr., intestate, Lou V. Eaton had qualified as community survivor of his estate, and had settled with and paid all his heirs except Mrs. Husted's mother, Effie Eaton, who had died intestate. The petition further alleged that before Mrs. Lou V. Eaton would agree to separate from Mrs. Husted and go to the home of Geo. W. Eaton, Jr., at the family conference, as above related, she exacted an oral agreement from George W. Eaton, Jr., to take over and manage the estate of Lou Eaton, together with Mrs. Husted's interest therein as inherited from her mother and grandfather, for the benefit of Lou Eaton during her lifetime and thereafter for the benefit of Mrs. Husted until the latter became twenty-one years of age. Then Mrs. Husted alleged that because of her removal from Texas, in about 1918, and her loss of contact with the family, she knew nothing of this trust agreement until after the London schoolhouse explosion; that, therefore, she had made no demand upon George W. Eaton, Jr., for her interest in the estate; and that the latter had no opportunity to settle with her under the terms of the trust because he did not know her whereabouts.

She alleged that, pursuant to this trust agreement, Lou V. Eaton had executed proper instruments of conveyance of all her property, including deeds to two tracts of land, 240 acres and 1 acre, respectively, the latter being the old home in London, and a bill of sale to her personal property, which consisted of her household and kitchen furniture and 10 promissory notes, amounting to $536.43. She alleged that Mrs. Lou Eaton had for many years carried a life insurance policy which was originally in favor of George W. Eaton, Sr., as beneficiary; that this policy was impressed with the same trust agreement as the land and

personal property and, when collected by George W. Eaton, Jr., was to be administered in the same manner. She alleged that all said property was turned over to George W. Eaton, Jr., by Lou Eaton on faith of the trust agreement and that he accepted it on that basis and died without ever repudiating the trust.

She further alleged that under the terms of the trust Geo. W. Eaton, Jr., had full power to receive the rents and revenues from the property, to collect the notes and to sell the lands and to reinvest the funds for her benefit, conditioned that he woud deliver the property or its proceeds to her when she became twenty-one years old. She alleged, further, that he did sell and exchange said property and that all of the trust funds and George W. Eaton's personal funds were so confused and commingled that it was impossible to trace the exact proportion of trust funds used in purchasing the properties which he owned at his death; that, therefore, she was the equitable owner of an undivided one fifth interest in all of them. Then she gave a specific description of thirteen different tracts of land in Rusk and Anderson Counties, more than 1,100 acres, which she alleged was so impressed with the trust.

Ruby Somerford et al, the heirs of George W. Eaton, Sr., and Lou V. Eaton, as distinguished from the heirs of George W. Eaton, Jr., the alleged trustee, admitted the trust alleged by Mrs. Husted but asserted that it was not for her exclusive benefit but was for the benefit of all the heirs of Lou V. Eaton and George W. Eaton, Sr. To establish this they sued Mrs. Husted and the other defendants in cross action.

The jury's verdict established: (1) the alleged trust as to the real and personal property conveyed to George Eaton, Jr., by Lou V. Eaton and as to the proceeds of the life insurance policy, to the extent of Mrs. Husted's interest therein as an heir of Lou V. Eaton, which interest or the proceeds thereof was to be delivered to her when she became 21 years old; (2) that it existed also for the benefit of the other heirs of Lou V. Eaton to the extent of whatever remained of the property at the time of Mrs. Eaton's death; and (3) that as to four of the thirteen tracts of land owned by George W. Eaton, Jr., at his death, 75 per cent of the consideration therefor was paid by him from the increase or proceeds of the original trust property. The verdict also established title by limitation in the heirs of George W. Eaton, Jr., as against all heirs of George W. Eaton, Sr., and Lou Eaton, except Mrs. Husted, as to whom the findings were favorable.

Before the verdict Mrs. Husted dismissed as to seven of the thirteen tracts on which she sought to fix the trust, and the court entered judgment against her as to four others. She was awarded recovery of a 1/8th interest in two tracts, designated in the briefs as the Estes and Forbes tracts, as well as the 1/8th undivided interest in the oil royalties therefrom, her interest in the oil that had already been taken being fixed by agreement at $13,134.48. To this judgment all parties excepted and gave notice of appeal. Only Herbert Eaton et al, the heirs of George W. Eaton, Jr., perfected an appeal. Mrs. Husted, however, cross-assigned error on the judgment denying her recovery of one of the tracts sued for. Except in so far as it awarded Mrs. Husted a money judgment against one defendant who was a non resident of the state, this judgment was affirmed by the Court of Civil Appeals at Texarkana. Mrs. Husted's cross assignment was likewise overruled. 163 S. W. (2d) 439.

Petitioners, Herbert Eaton et al, assign fourteen points of error in the judgment of the Court of Civil Appeals; two of which assail the holding of that court that the evidence was sufficient to establish a parol trust. The proposition is that, at most, the evidence merely shows an agreement by George Eaton, Jr., to take over and manage Lou Eaton's property and does not show any agreement to impose a trust upon the conveyances, absolute in form, excuted and delivered by Lou Eaton more than a month later.

When the family conference was called in December, 1907, Lou Eaton was old, infirm, and sick. She must have known that the end was near. Nevertheless, the record fully establishes the fact that she would not go to the home of her son, George, until some provision was made for Mrs. Husted because, as an old neighbor testified, "she was worried about that kid's future, * * * about what would become of the kid" and had constantly in her mind that her own children "had ostracised her and turned their backs on her on account of the kid." This witness further testified that Mrs. Lou Eaton often expressed these worries and had said, "When I pass out I want Lee Dell to have her part and my part." Another friend of Mrs. Eaton's testified that a short time before Mrs. Eaton moved to the home of George Eaton she had stated that "she was going to fix things so that Lee Dell would get her mother's part." W. A. Eaton, a brother of George Eaton, Jr., who attended the family conference, testified that it was agreed that George was to take his mother into his home and care for her the rest of her days and was to take over her property and "run it as his own"; that his

mother wanted to know how they had arranged for Lee Dell and said she was not going to give the child up unless assured that the latter would be cared for; that "she wanted Lee Dell seen after and her part of the estate was to be cared for and at her age—when she became of age she was to get her part of the estate, that was the agreement"; that George assented to this arrangement and agreed to carry it out. In view of all this, particularly Lou Eaton's great love for Lee Dell and deep concern for her welfare, it is significant that within a month after the conference, Lou Eaton executed to George Eaton, Jr., a deed conveying her home in London and 150 acres of land in Rusk County, in consideration of one dollar and love and affection, and a bill of sale covering all her personal property, "for vaue received." It is still more significant that about a month before his death George Eaton told his brother, W. A. Eaton, that "he would like to know where Lee Dell was and that he would like to make a settlement with her and get shed of that part of the estate, get that off his hands, he didn't want to be bothered with it if he could find her." Moreover, his widow testified that he recognized that Mrs. Husted had an undivided interest in the "Irwin place." John Talley, a boyhood friend of George Eaton's, who owed one of the notes Lou Eaton transferred to George, testified that some of the other Eatons protested his paying George, which objection led him to inquire of George as to the latter's authority to collect, whereupon George said that he had settled with some of the heirs "and until such time that Lee Dell came of the age of twenty-one he was going to handle her business and make the proper settlement then." Talley's testimony was fully corroborated by another witness, who heard the conversation.

■ In the face of these facts, we cannot say, as a matter of law, that the Court of Civil Appeals was wrong in holding that there was sufficient evidence of an agreement preceding the deeds and bill of sale from Lou Eaton to George to establish a trust in favor of Mrs. Husted to the extent of her interest in the property so conveyed. We think their conclusion is correct. There is no other apparent explanation for the conveyances. If there could have been any doubt as to the creation of a trust in the property it was removed by George Eaton's acknowledgments. 1 Bogert Trust, p. 269. On the whole, the evidence supporting the jury findings makes it reasonably clear and certain that a parol trust was created as asserted by the respondents. McBride v. Briggs et al (Civ. App.), 199 S. W., 341. We thus view the evidence most strongly in support of the trial court's

judgment. Briscoe v. Bright's Adm'r. (Com. App.), 231 S. W., 1082.

■ Two points of error present the proposition that there was no proof that an insurance policy on the life of Lou Eaton, with George, Jr., as beneficiary, was covered by the trust agreement. The policy was a benefit certificate in the Knights and Ladies of Honor, an organization long defunct at the time of the trial. Lou Eaton had carried it for years, but, as the records of the company had been lost, there was no proof as to who the original beneficiary was. However, it was shown that just before she went to live with George Eaton, Jr., she made him the beneficiary and that he collected the proceeds after her death. In testifying about the arrangement made at the family conference for George Eaton to take care of his mother, W. A. Eaton said that George was to take over his mother's property and run it as his own and was to give Lee Dell her part when she became of age; that what Lou Eaton had left at that time consisted of "some little money and *insurance* and a little property in London" (Italics ours) ; that the agreement embraced all her property. We think this testimony, considered in connection with the fact that George Eaton, Jr., was made beneficiary in the policy at about the same time that the two deeds and the bill of sale were executed to him, was some evidence that Lou Eaton intended that the proceeds of the policy should constitute a part of the trusts funds and that George Eaton accepted it as trustee, and that, therefore, we would not be warranted in disturbing the jury verdict on that issue. That the insured could thus impress a trust upon the proceeds of the policy in the hands of George Eaton, proof of which could rest in parol, was definitely settled in Dunn v. Second National Bank of Houston, 131 Texas, 198, 113 S. W. (2d) 165.

■ Petitioners contend that the alleged parol trust was testamentary in character in so far as it was created for the benefit of those who might be the heirs of Mrs. Eaton at her death and in so far as it covered the property she might own when she died. It is enough to say that Mrs. Eaton retained no dominion over the property; she surrendered its possession and control and all her estate therein to George Eaton, who was to "run it as his own"; she reserved no right to revoke the grant and did not attempt to exercise any such right. Therefore, the grant was not testamentary in character. 16 Am. Jur., p. 539, sec. 181.

Petitioners complain at the judgment establishing the trust because there was no showing as to what was left in George

Eaton's hands of Lou Eaton's estate at her death, it being their contention that the agreement was that Mrs. Husted was to share only in what was so left.

It is clear from the record before us that, under the trust agreement, George Eaton received the old home place in London, 150 acres of land in Rusk County, one piano, Lou Eaton's household effects and kitchen furniture, a small, undesignated amount of cash, notes due her aggregating $536.43, and her interest in the estate of her deceased son, Jeff L. Eaton, as well as the insurance money. What became of the piano, household and kitchen furniture, the Jeff Eaton estate, the money on hand and some of the notes does not appear. Whether they were on hand at Lou Eaton's death is not shown. So far as the pleadings and proof discloses, it may be that they were sufficient to care for Lou Eaton and to defray her funeral expenses, which, George Eaton's widow testified "were about $750.00." And it may be that they were used for that purpose. In any event, the record undisputably shows that when Lou Eaton died George Eaton still had in his possession the two tracts of land and at least one of the notes, as well as the insurance policy, and that all of these items had remained in his hands for seven months after her death and some of it for more than four years thereafter. The insurance money was not collected until September, 1908. A $105.00 note due her was paid in 1910. One tract of her land was sold in 1908, the other in 1912. Certain it is that he took what money he thus received from his mother's estate and commingled and confused it with his own funds and estate. More than twenty-four years after he had disposed of the last known item of his mother's estate, George Eaton had expressed a desire to make a settlement with Mrs. Husted so that he would no longer be bothered with her part. Yet he had kept no books, he left no evidence of what he owed her or of any claim he might have against her on account of caring for and burying his mother. He had, in truth, dealt with the estate "as his own."

A great authority has written that "where there has been no positive loss, but the whole funds, principal, profits and proceeds, are in the trustee's hand in their mingled condition, the burden of proof rests upon him of showing most conclusively what portion is his, and whatever of the mixed fund, including both profits and principal, he cannot thus show to be his own, even though it be the whole mass, will be awarded to the beneficiary." Pomeroy, Eq. Jur., (4th Ed.), vol. 3, sec. 1076, p. 2471. Another writer has said that the trustee must not mingle the trust fund with his own; that, if he does, the beneficiary may

follow the trust property, and claim every part of the blended property *which the trustee cannot identify as his own;* that if he fails to keep clear, distinct and accurate accounts, all presumptions are against him, and *all obscurities and doubts are to be taken adversely to him.* Perry, Trusts & Trustees (6th Ed.), vol. 1, sec. 447, p. 717, vol. 2, sec. 821, p. 1351; ibid., 7th edition, vol. 1, sec. 447, and vol. 2, secs. 837, 838. In Andrews v. Brown (Com. App.), 10 S. W. (2d) 707, it is held that if a trustee mixes trust funds with his own, the whole will be treated as trust property, except so far as he may be able to distinguish what is his own.

■ Since it is undisputed that George Eaton did have in his possession physical properties of the estate of Lou Eaton long after her death, which he liquidated and commingled with his own, it was the burden of petitioners, who stand in his shoes, to distinguish what belonged to him by reason of any expenditure on account of Lou Eaton; it was their obligation to plead and prove what belonged to them on that score. Yet they do not even attempt any pleading on that issue. We think the justness of the rule placing this burden on petitioners is obvious. Mrs. Husted was an infant when the trust was created, and it was not until thirty years later that she learned there was any trust. Opposed by unfriendly claimants, the heirs of the dead trustee, who had accorded her no consideration even before there was any property dispute, she was in no position to know how the trust had been administered or to learn what had become of its properties. "Where facts lie peculiarly within the knowledge of a party and cannot, in the nature of the case, be known to his adversary, the party having knowledge has the burden of proving such facts." Spencer v. Pettit (Civ. App.), 17 S. W. (2d) 1102 (Affirmed, 34 S. W. (2d) 798).

What we have said disposes also of petitioners' complaint at the refusal of the trial court to submit their requested issue as to the amount of money expended by George W. Eaton on Lou V. Eaton during her lifetime. They tendered no pleading to support the issue.

■ Two points of error complain of the holding by the Court of Civil Appeals that the evidence was sufficient to support the jury's finding that trust funds were used by George Eaton in purchasing the Forbes and Estes tracts.

There is direct testimony with respect to the Forbes tract. It was given by the witness, H. B. Young, who became acquainted with George Eaton in 1907 or 1908 and knew him

well until 1927, when the witness moved to Oklahoma. They were lodge brethren. Young sworn that Eaton told him on one occasion that he, Eaton, had $900.00 of his mother's insurance money buried in a fruit jar in his garden, and that Eaton at a later date told witness that he had spent this money to pay for the Forbes land. The record shows that the Forbes tract was deeded to Eaton on February 26, 1912, for a consideration of $900.00 cash and that it consisted of 91.8 acres. In 1917 he sold part of this, leaving a balance of 13.67 acres, which is one of the two tracts on which the trial court impressed the trust in favor of Mrs. Husted. There is testimony in the record which wholly refutes this fruit-jar version, and petitioners argue that it is altogether unlikely that George Eaton so kept the insurance money for some two and a half years. However, it is not for us to pass on the probability of that occurrence. Certainly it was not impossible for it to have happened as related by Young. It seems that the jury believed his story and rejected the testimony to the contrary. It is not our province to say, as a matter of law, that they were not justified in doing so.

■ More difficulty attends the question as to whether trust funds were used to purchase the Estes tract, but we think the action of the courts below in fixing a trust on it may properly be grounded on the doctrine of commingling. The quotations which we have already made from Pomeroy and Perry support this view. Moreover, "As a general rule the cestui que trust's equitable right of recovery is not destroyed by reason of the fact that the trustee has so commingled the trust property with his own property that it is impossible particularly to identify the trust property; for, unless the trust property is such that it can be ascertained and separated from the rest, the entire commingled fund or property will be treated as subject to the trust * * * *except in so far as the trustee may be able to distinguish and separate that which is his own.*" (Italics ours) 65 C. J., sec. 899, p. 972. Otherwise, the law would be placing a premium rather than a penalty on the trustee's violation of his imperative duty to keep regular and accurate accounts during the whole course of the trust. Pomeroy, Eq. Jur. (4th Ed.) vol. 3, sec. 1063.

With the insurance money traced to the Forbes tract, there remains of the trust property conclusively shown to have been in George Eaton's hands after his mother's death and not positively accounted for thereafter the two tracts of land and the $105.00 note. However, it does appear that these items were later liquidated by the trustee and their proceeds confused with his personal funds. It is true that Eaton bought the Estes tract

of 84 1/4 acres on June 28, 1912, whereas he did not sell one of the tracts deeded to him by his mother and known as the Irwin place until November 14, 1912. Yet in the purchase of the Estes tract he executed three vendor's lien notes in the sum of $120.00, $200.00 and $200.00 dated May 20, 1912, and due *November* 20, 1912, 1913, and 1914, respectively, and there may be more than a mere coincidence in the fact that when he sold the Irwin tract on *November* 14, 1912, Eaton got $292.50 cash and took two vendor's lien notes for $225.00 each due *November* 13, 1913 and 1914, respectively. And it was the Irwin tract, in which, according to the testimony of his widow, George Eaton recognized that Mrs. Husted had an undivided interest. Moreover, in 1931, he sold part of this Estes tract leaving only 53.79 acres, against which the trust is impressed by the judgment of the courts below.

We think a much stronger case of identification and tracing of trust funds is presented here with respect to the Estes and Forbes tracts than was shown in Spencer et al v. Pettit et al (Com. App.), 34 S. W. (2d) 798. There the children of J. H. Pettit and his wife, Amanda Pettit, deceased, were allowed a recovery of real estate purchased by Pettit while living with his second wife, upon the theory of a constructive trust therein in their favor because Pettit had used funds and properties belonging to them in the acquisition thereof. The community estate, in which the plaintiffs admittedly had an interest when their mother died, consisted of three sections of land and cattle, horses, mules, farming implements, household furniture and the like. They had been given their part of the land but had never received any part of the personal property. After the death of his first wife, the mother of the plaintiffs, Pettit "continued the ranching business in much the same manner that he had conducted it during the lifetime of his wife. He continued in the possession of the personal property of the community, and sold the same. He took the proceeds thereof and the increase, and invested the same in other properties of a like or similar character, and mixed and mingled such proceeds with funds and properties which he acquired after his wife's death. He continued to do this for years, buying and selling all of the time. He also during this time borrowed money at various and sundry times in large and small amounts and from various parties, including banks and individuals. He would buy cattle, sheep, and other live stock with these funds so acquired and later sell the same, together with their increase, and pay the debts for the borrowed money. These borrowed funds were also mixed and mingled in such a manner that they lost their identity. In the

course of these dealings he so mixed and mingled the proceeds of the original personal property on hand when his wife died that it lost its identity, and the record fails to in any manner account for what became of same except as shown above." In addition to the proof of this mixing of funds and properties of the two estates, the testimony of Pettit himself was that he was unable to tell what funds were used in the purchase of the tracts of land owned by the second community, "That is, he was unable to tell whether he purchased the land with money borrowed or with funds on hand, from the sale of cattle and other live stock, or how he got the money." Then all assignments of error that there was no evidence that the funds of the children had been traced into the cash payments for the land were overruled. Perceiving no difference between the principles applied there and those which should be applied here, we overrule the points of error complaining of the holding by the Court of Civil Appeals that the evidence was sufficient to support the jury's finding that trust funds were used by Eaton in purchasing the Forbes and Estes tracts.

It must be remembered that we have in this case no intervening rights of creditors of George Eaton, that we have no innocent purchaser whose rights or interests will be affected. The petitioners, claiming as heirs of the trustee, can assert no rights or equities which he could not assert were he the defendant. The principle applied may, in some respects, seem hard and not free from difficulty. Nevertheless, "The principle, we apprehend, is but a part of equity's declination to extricate the wrongdoer from self-imposed hard conditions, or to tax the innocent, where one of two not in pari delicto must suffer." Andrews v. Brown, supra. It is true, as asserted by petitioners, that on November 22, 1938, the surviving wife of George W. Eaton, Jr., the deceased trustee, conveyed to J. L. Eaton, trustee for petitioners, certain lands that had belonged to the community of herself and her husband, among which was included the Estes and Forbes tracts. But they had already inherited their father's interests as heirs and the deed conveyed the mother's interest in consideration of love and affection. Therefore, petitioners do not stand as innocent purchasers, even as to their mother's interest, so as to affect the trust in favor of Mrs. Husted. That interest was affected with the trust to the same extent as was the community interest of George Eaton, Jr., and since petitioners did not acquire it by onerous title, it is likewise impressed with the trust in their hands.

The trial court awarded Mrs. Husted a recovery of $3,750.00 as her 1/8th interest in a bonus received by George Eaton, Jr.,

for an oil and gas lease interest in a bonus received by George Eaton, Jr., for an oil and gas lease on the 13.67 acre Forbes tract. Petitioners urge that this was error because (1) they acquired their interest by deed and not by inheritance, and (2) there is no evidence that George Eaton paid them any part of the bonus money. What we have just said disposed of the first ground of objection, so it is overruled. We think the second ground is untenable because 1/8th of the bonus money received by George Eaton for the Forbes lease belonged to the trust estate of Mrs. Husted, the same as 1/8th of the fee title to that tract belonged to her. Petitioners received not only the Forbes tract but all other property, real and personal, belonging to George Eaton and they took it enriched to the extent of the $30,000.00 bonus money collected by him. "Wherever property is conveyed or transferred by the trustee not in the course of executing and carrying into effect the terms of an express trust, * * * the rule is universal that the heir, devisee, successor, or other voluntary transferee, * * *acquires and holds the property subject to the same trust which before existed, and becomes himself a trustee for the original beneficiary." 26 R. C. L., sec. 225, p. 1362. Hence, we hold that the judgment in the respect complained of was not improper. See Restatement of the Law of Trusts, sec. 202 h, pp. 540 & 541.

There are three points of error complaining of argument of respondents' counsel before the jury. We have examined the authorities cited in the briefs, as well as the portions of the record bearing on the questions presented by these points, and we have concluded that the Court of Civil Appeals correctly held that no reversible error appears in any of them. To discuss them further would be to extend an already long opinion.

The judgment of the Court of Civil Appeals is affirmed.

Opinion adopted by the Supreme Court May 26, 1943.

Rehearing overruled July 14, 1943.