Clarence W. **LOKEY**, Petitioner,

v.

The **TEXAS METHODIST FOUNDATION**
et al., Respondents.

No. B–2885.

Supreme Court of Texas.

April 5, 1972.

Rehearings Denied May 10, 1972.

Judgments reversed, and cause remanded to trial court for further proceedings.

McCulloch, Ray, Trotti & Hemphill, Ross H. Hemphill and William A. French, III, Dallas, for petitioner.

Clark, Thomas, Harris, Denius & Winters, Conrad P. Werkenthin and Mary Joe Carroll, Austin. McGinnis, Lochridge & Kilgore, George D. Byfield, Shannon H. Ratliff and Peter M. Lowry, Austin, Crawford Martin, Atty. Gen., Z. T. Fortescue, III, Asst. Atty. Gen., Austin, for respondents.

STEAKLEY, Justice.

This suit involves a charitable trust known as the K & L Trust, with an original res of $100,000, and an additional fund of $40,000, identified as the K & L—"A" Trust. The suit was instituted by Clarence W. Lokey, petitioner, against the Texas Methodist Foundation and the Attorney General of Texas. The primary relief sought is the removal of the Texas Methodist Foundation as trustee over the funds, and the transfer of the funds in the K & L Trust to the trustees of Southwestern University in Georgetown, Texas, and the transfer of the funds in the K & L —"A" Trust to what is identified as the "Lokey Trust." Alternatively, petitioner sought declaratory judgment relief pertaining to the trusts. The National Division of the Board of Missions of the United Methodist Church intervened. It sued petitioner and the Foundation for cancellation of the trust agreements between them and a declaration that the trust funds are held for its sole use.

The trial court ruled in response to pleas raising the issues that petitioner did not have standing to bring the suit but that the intervenor National Division did have standing. The court ordered a dismissal of petitioner's suit and sustained the motion for summary judgment of the National Division. The summary judgment record includes, in addition to the pleadings and motions of the parties, depositions of the various principals. In granting the motion of the intervenor National Division for summary judgment, the court declared the trusts null and void and that the Foundation is holding the trust res for the National Division. Only petitioner appealed from this judgment. The Court of Civil Appeals dismissed petitioner's appeal, holding that he had no standing to institute and prosecute the suit, citing Coffee v. William Marsh Rice University, 403 S.W.2d 340 (Tex.1966); and Carroll v. City of Beaumont, 18 S.W.2d 813 (Tex.Civ.App., 1929, writ ref'd) 468 S.W.2d 945. The intermediate court did not rule on petitioner's points which asserted error of the trial court in overruling his plea that the National Division did not have standing to intervene, and in granting its motion for summary judgment. It is also to be noted that the Attorney General filed an answer in the nature of a general denial but makes common cause with the other respondents in their claim that petitioner does not have standing.

We draw these facts from the summary judgment record. Petitioner is an ordained Methodist minister attached to the Texas Annual Conference of the United Methodist Church. The respondent and intervenor National Division is one of the three divisions of the Board of Missions of the United Methodist Church. In 1944, petitioner was released to work for the National Division and from 1948 held the title of Superintendent of Spanish-speaking Missions. He served the National Division in this capacity until his retirement in 1966. His salary and operating expenses were paid either by the National Division or out of funds raised by petitioner for the National Division. He was appointed by and worked closely with Methodist Bishop A. Frank Smith, who was President of the Board of Missions, until his death in 1962. Thereafter, petitioner's appointment was renewed annually by the presiding Bishop. The Rio Grande Conference includes local churches in Texas and New Mexico staffed

by Spanish-speaking ministers. A primary objective of the National Division is the strengthening of the work of the Rio Grande Conference by financial assistance. One of petitioner's duties for the National Division was the raising of money.

The initial trust agreement was in writing and was dated January 8, 1963; however, it was not executed by petitioner and respondent, the Texas Methodist Foundation, until sometime in the following year. By its terms, petitioner was identified as Settlor and the Foundation as Trustee. The instrument recited the transfer in cash to the Trustee by the Settlor of $100,000. This sum was represented by a check dated January 4, 1963, and drawn on an account with the Tyler Bank & Trust Company in the name of "The Methodist Church Spanish Speaking Missions, Clarence W. Lokey, Superintendent." This account was opened under date of November 23, 1955. The source of funds deposited in the account from time to time included checks from the Division of National Missions, and checks variously payable to the order of petitioner, to the order of the Treasurer of the Board of Spanish Speaking Missions, and to the order of the Division of National Missions.

The powers of the Foundation as Trustee were limited in the trust agreement as follows:

"While The Texas Methodist Foundation is appointed herein as Trustee for the purpose of investing the funds comprising the trust estate of this trust, the distribution of the funds shall be at the direction of the following persons:

"(a) Dr. C. W. Lokey, and such direct descendant of his as he may designate, either during his lifetime or in his Will.

"(b) Dr. Monroe Vivion, or, if he shall fail or refuse to serve or to continue to serve in the capacity appointed herein, then to his successor as Executive Director of The Texas Methodist Foundation; and

"(c) One other person named by the above two.

"It is intended that the three persons who will function as described above shall pass on their offices in the manner indicated above. A majority of such persons shall be able to act on behalf of all and The Texas Methodist Foundation may rely upon the direction of any one of the above or his successor as appointed herein in making any distributions of trust assets."

The primary purpose of the trust was stated to be the stabilizing and strengthening of the ministry of the Methodist Church with regard to people of Mexican, South American or Central American backgrounds. Additionally, it was stated that the trust fund may be administered for needed support of retired preachers, their widows and dependent children, of the Rio Grande Conference. It was then stated that any funds not distributed for such purposes shall be distributed "(1) for a chair of International Studies at Southwestern University in Georgetown, Texas; (2) for international scholarships; and (3) for exchange international professorships, all at Southwestern University in Georgetown, Texas, in so far as the income from the trust will provide." The trust agreement recited that the trust was irrevocable; that the funds should never be used for other than religious, charitable, scientific, literary or educational purposes; that the proceeds of the trust should be paid to the Foundation if the trust terminated for any reason; and that if the Foundation should cease to exist, the funds should be distributed to Southwestern University or its successor.

Petitioner later delivered to the Foundation a check dated July 8, 1964, in the sum of $40,000 drawn on the same account as the original check in the sum of $100,000 and forming the res of the K & L—"A" Trust. This matter was handled informally by petitioner and Dr. Vivion, the Executive Secretary of the Foundation, and is part of the controversy between them.

It is not disputed that the funds in question were raised by petitioner during the period of, and in connection with, his assignment to the National Division of the Board of Missions. He says, however, "The donors gave him money to spend as he and Methodist Bishop A. Frank Smith deemed best, provided it did not go to the respondent Board." He stated that he maintained a common account composed of donated funds to be transmitted to the National Division and donated funds subject to his and Bishop Smith's control by donor restriction. He did not identify by the name of the donor, or by document, any gifts to him to be used by him and Bishop Smith but stated that the funds were given to be administered by them for purposes over and above and away from and not in "that framework," i. e., not as funds to be used by the Board of Missions. He had no separate records of these gifts and no one but he and Bishop Smith knew about the $100,000, and the later $40,000 subsequently transferred to the Foundation as Trustee. He stated that he personally gave some of the money but had no record or "clear recollection of" how much money he personally gave. The withholding from the National Division of the portion of the commingled funds ultimately forming the res of the trust was pursuant to "a decision" by petitioner and Bishop Smith that they would raise money over and beyond their commitment to the National Division, which money would not be handled through or revealed to the National Division, but would "stay in the area to serve the needs of the area." It is also to be noted that the judgment of the trial court recites that counsel for petitioner stipulated that he "did not claim individual ownership of either the $100,000 or the $40,000 but claimed to be a trustee of such money, made such by the donors thereof."

Taking this at full-face import, it would appear that contributions were made to petitioner and Bishop Smith for local use in fostering the missionary program of the Methodist Church among Spanish-speaking people; that petitioner considered these contributions to have amounted to the sums placed in the trusts; and that petitioner entered into the trust agreements with the Foundation for the purpose of applying the funds to the purposes for which they were donated.

The unusualness of the circumstances at hand is self-evident. There are reasons to believe that all the principals have acted in good faith. The common and primary purpose of all the parties has been the furtherance of the work of the Methodist Church among Spanish-speaking people, particularly in the Rio Grande Conference; and the caring for retired preachers of this Conference, and for their families. This was the purpose of the donations to petitioner; a portion of his deposition testimony in this respect is copied in the margin.[1] The conflict which has arisen

---

1. Q Did anyone give you any money with the instructions or direction that you place it in trust as you did do?
A No, I don't think that was—
Q There wasn't a single donation made to you, was there, where somebody said, "I am giving you this. Now, you take it and put it in trust with The Texas Methodist Foundation," or anybody else?
A There was a good deal of acceptance and appreciation of the work I had done over a long time, practically my life, in the ministry, and I had a good many people who would say, "Lokey, here is money. You use it. I would like for it to either be a thing that you will benefit by or a thing that will carry on your work and be a memorial to you and the work you have done over these more than a quarter of a century on the Board and in the Spanish Speaking Work."
Q These would be gifts made before your retirement?
A Not necessarily. Some time before, yes, but not necessarily immediately before it, but I was beginning to get appreciation of the work a long time ago.
. . .
Q Dr. Lokey, is it your feeling that there is neither anyone in the National Division nor in the Rio Grande Conference who can decide how this money is to be used?
A That's right. Nobody but myself after the Bishop was gone. That was agreed on.
Q You are saying that because that is the way you figure you received the

concerns where, and in what manner, and by whom, the trust funds will be used in furthering this common purpose; a portion of petitioner's deposition testimony as to this is also copied in the margin.[2] Petitioner seeks by this suit to remove the Foundation as Trustee and to have the funds held in the K. & L. Trust transferred to Southwestern University, and those held in the K. & L.—"A" Trust transferred to the "Lokey Trust." The National Division by its intervention seeks to destroy the trust and to free the funds for its use and benefit, particularly in the Rio Grande Conference. The Foundation seeks to enforce the trust agreement as it understands its terms, but did not resist the intervention of the National Division or its motion for summary judgment, and did not appeal from the judgment in its favor. If petitioner has standing to bring this suit, he has standing to complain of the action of the trial court in overruling his plea against the standing of the intervenor, and in granting the motion of the intervenor for summary judgment. This latter action of the

money, or are you saying you are the only man that really knows how it ought to be spent?

A No, no. I am not saying I am the only man who knows how money ought to be spent. I am the only man who was authorized to direct the spending of this money.

Q When you say that, you are talking about—is that a condition under which the money was turned over to you or something Bishop Smith told you?

A Well, many of the people who gave it made that expression to me.

Q What did they say?

A They said, "Lokey, you have done a grand job. You have rendered a magnificent service, and I would like to have a part in seeing that this thing is recognized and carried on after you are gone." So we began to build to that end, and that is the thing out of which it grew, and Bishop Smith agreed to that thoroughly.

Q So anybody that gave any money with a statement like "We think that you are doing a good job, and we would like to see this carried on after you are gone," then you put that money aside as being money which should not be reported to the National Division but—

A I had no reason to report it to the National Division. If people gave you money that was to be handled by you definitely for things as you saw, would you need to report it to anybody else? I wasn't involved any more than you would be.

Q Well, at the time that these gifts were made to you, you were doing only work for the Spanish speaking people?

A This will go on serving the interest of the Methodist Church's ministry in the Spanish speaking—group of Spanish speaking extraction long after I am gone, I hope.

2. Q Now, do I understand that you want this $140,000.00 to be turned over to Southwestern University; is that right?

A That's right.

Q C. W. Lokey Scholarship Fund or something like that?

A No. We had hoped—it was in my mind a considerably larger endowment for this thing, and if it had been handled right and I had been given a chance to handle it like it ought to be handled it would have been and could have been a great deal more, but when Monroe began to violate our contract I realized that if I were gone there would be nobody to defend it, so we have got to get it out of the hands of The Methodist Foundation in order for it to have any safety. And we put it in Southwestern University with specific instructions that it shall advance the interest of—well, of all people, but solidify the Spanish-American group as a part of the United States rather than just an antagonistic group.

Q If you are able to succeed in this lawsuit this is what you intend to do?

A That's right. That is what I intend to do.

Q And therefore the superannuated pastors and the widows of pastors of the Rio Grande Conference will not receive any benefit from this fund at all?

A That's right. The Church is responsible for that, and if we put this money in that we would be destroying it for the purpose for which it was given.

Q And if Southwestern gets it under the terms which you want it to get it, it need not spend it even on Spanish speaking people; it can spend it on anybody it wants to. Is that right?

A No, no. It will have to be used in the education of people in the direction of solidifying the various groups, particularly those from Central and South America. Now, it is not to be scholarships. We have planned originally, and I hope we might go ahead and make an endowment of a chair which would be to support the interest of Spanish speaking causes in America, South and North, people from Mexico, Central and South America as well.

trial court was in error if the intervenor did not have standing, or, if so, if it nevertheless did not discharge its burden as the movant for summary judgment. ·

■ Article 7425b–24 of the Texas Trust Act invests the district court with original jurisdiction of matters affecting any trust instrument and provides that "actions hereunder may be brought by a trustee, beneficiary, or any person affected by or having an active interest in the administration of. the trust estate." Article 7425b–39 authorizes the removal of trustees under certain conditions "on petition of any person actually interested." In our view, petitioner and the intervenor National Division meet these requirements and have standing to litigate the controversies which have arisen. Petitioner was the chief actor in raising and handling the funds in question and he is one of a committee of three charged with the duty and responsibility of directing the distribution of the $100,000 trust fund, upon any one of which the Foundation may rely in making distribution of trust assets. He and the Foundation are also in controversy as to the terms and conditions under which the fund of $40,000 was delivered and received, and as to the status of this fund under all the circumstances. The intervenor National Division claims the funds as its own in all events and sues to have them freed from the trusts for its use and benefit. It squares with a reasonable construction of the quoted provisions of the Texas Trust Act, and with the history of the funds and the precipitating factors to this unfortunate litigation, to recognize the right of these principals to their day in court as parties actively interested. They have a special interest not shared by the general public.

■ We did not rule in Coffee v. William Marsh Rice University, 403 S.W.2d 340 (Tex.1966), that parties other than the Attorney General are precluded from instituting litigation involving a charitable trust. We pointed out that this question was not before us and the above noted provisions of the Texas Trust Act were not there considered. Even so, we recognized in *Rice University* that the Attorney General is not generally regarded as the only person who can bring a suit to enforce or attack a charitable trust, or to question its operation; but that any other person doing so must have some special interest in the performance of the trust different from that of the general public. We also emphasized that Article 4412a does not say that the Attorney General is the preclusive party in suits involving charitable trusts. The fact that it is the certain duty of the Attorney General to invoke the powers inherent in our courts to prevent an abuse of a charitable trust does not deny the power of a court in the exercise of its chancery powers from intervening when its jurisdiction is otherwise properly invoked. Cf. Boyd v. Frost National Bank, 145 Tex. 206, 196 S.W.2d 497 (1946); and Powers v. First National Bank of Corsicana, 138 Tex. 604, 161 S.W.2d 273 (1942). Carroll v. City of Beaumont, 18 S.W.2d 813 (Tex. Civ.App.1929, writ ref'd), recognizes that jurisdiction of the courts may be invoked by parties other than the Attorney General, i. e., those having "peculiar or individual rights, distinct from those of the public at large," they being parties "legally concerned," as we have held is the case with petitioner and the intervenor National Division.

■ This brings us to the question of whether the National Division discharged its burden as the successful movant for summary judgment. We have articulated this burden more than once. See Torres v. Western Casualty and Surety Company, 457 S.W.2d 50 (Tex.1970); Gibbs v. General Motors Corporation, 450 S.W.2d 827 (Tex. 1970); Prestegord v. Glenn, 441 S.W.2d 185 (Tex.1969), second appeal 456 S.W.2d 901 (Tex.1970). The requirements of Rule 166–A, Texas Rules of Civil Procedure, apply alike to plaintiffs and defendants who move for summary judgment. The summary judgment record must establish a right to judgment as a matter of law. As the movant for summary judgment in its suit against petitioner and the Foundation,

the National Division was under the burden of establishing that there was no genuine issue of fact respecting the elements of its plea for relief apart from petitioner's suit against the Foundation, and that, as a matter of law, it was entitled to judgment cancelling the trust agreements and declaring that the trust funds are held by the Foundation for the sole use of the National Division.

The summary judgment record consists of the pleadings of the parties and the depositions of petitioner, of Dr. Monroe Vivion, the former Executive Director of the Methodist Foundation, and of W. A. Pounds, an officer of the Tyler Bank & Trust Company who served as treasurer of the Board of Spanish-Speaking Missions, together with certain exhibits including the Book of Discipline of The United Methodist Church, and an affidavit of petitioner in opposition to the motion of the intervenor for summary judgment. Respondents say that this record establishes as a matter of law that all funds received by petitioner were National Division funds and hence were not subject to use by petitioner in funding the trusts; and that this being shown, the trial court correctly decreed the trusts null and void, and that the trust res is held by the Foundation for the use and benefit of the National Division. They argue these conclusions from three assertions: first, that the record establishes that petitioner was not authorized to apply any funds received by him while in the employ of the National Division except as directed and authorized by the National Division itself, it being implicit in this argument that he was not so authorized by virtue of his position and that Bishop Smith, the presiding Bishop and President of the Board of Missions, had no authority in such respects and, if so, that he did not authorize petitioner to solicit and accept restricted donations; second, that the testimony of petitioner establishes that the donors did not restrict their gifts in such a manner as to authorize the use of such funds other than as directed by the National Division; and third, that in any

event the funds in question were not subject to disposition for purposes other than as directed by the National Division, irrespective of the restriction placed upon the gifts by the donors and the authority of petitioner to accept and use the funds in the manner stipulated by the donors, since, they say, petitioner testified in his depositions that he commingled such funds with those admittedly belonging to the National Division and did not distinguish the restricted funds except to say that the latter amounted to the sums of $100,000 and $40,000 which he placed in trust. As we view the record, however, there are fact issues in each of these respects. Indeed, the National Division rests its case for summary judgment principally upon the claimed failure of petitioner in his deposition testimony to distinguish National Division funds from those restricted by the donors for uses other than by the National Division.

It is shown that under Methodist Discipline petitioner as an active Methodist minister was attached to the Texas Annual Conference and later to the Rio Grande Conference even while under assignment to the Board of Missions; that for most of the years in question his superior was Bishop A. Frank Smith, both as Bishop of these two Conferences and as President of the Board of Missions; and that petitioner was subject in important respects to the direction and control of Bishop Smith, and his successor, Bishop Paul E. Martin. Petitioner further testified that Bishop Smith approved and authorized his activities in soliciting and accepting gifts restricted to the uses sought to be exemplified in the trusts established by petitioner; that he did solicit and receive such gifts; and that the initial trust agreement was drawn to accomplish the joint purposes of petitioner, Bishop Smith and the donors. This is not factually disputed although respondents would give a different interpretation to some of petitioner's deposition testimony.

It is manifest that there are perplexing problems to be solved in the suit of National Division as intervenor against petitioner and the Foundation, as well as in the rein-

stated suit of petitioner, and there should be a full development of the facts. Consideration must be given to the acts, records and recollections of the principals over a long period of time and the application of Discipline in the Methodist Church to what occurred. For example, petitioner stated in an affidavit opposing National Division's motion for summary judgment that the Minutes of the meeting of the Rio Grande Conference Board of Missions on April 22, 1966, reflected that on such occasion the Executive Secretary of the Board of Missions announced that the National Division's Treasurer and Comptroller had examined the books of petitioner and his Secretary "and found them in good order." Although the Minutes referred to do not specify the date of the examination, the National Division appears to recognize in its brief that the books were audited in 1966. If so, this was approximately two years after the establishment of the trusts in question and the transfer to the Foundation of the trust funds of $100,000 and $40,000 by means of checks drawn on the audited account. Further, the retirement of petitioner from his assignment to the National Division was in 1966 when an examination of his accounts would have been in order. Petitioner further stated in his affidavit that he had received a carbon copy of a letter dated February 1, 1967, written by the then Executive Secretary of the Foundation and addressed to the same Executive Director of the National Division and in which it was stated that the trust was established after he and petitioner talked with Bishop Martin; that the trust was established "in accordance with the concern of the donors;" that "The money that was used to establish the trust was given by interested individuals, after consultation with Dr. Lokey, to be administered by the committee set up by the trust with the donors remaining anonymous;" and that neither the Board of Missions nor any of its departments have any responsibility either in the handling of the trust or of the expenditure of the income.

When consideration is given to the complex factual background to this controversy, particularly when viewed in the light of these acts of the administrative officers of the National Division and the Foundation who are in common cause against petitioner, we cannot agree that the record establishes the non-existence of fact issues between the parties, and that as a matter of law the trusts before us are void and the trust funds subject to the exclusive use and control of the National Division.

This is not to prejudge the legal effect of the facts when fully developed by the National Division in the trial of its suit against petitioner and the Foundation. We hold only that as the movant for summary judgment, the National Division did not discharge its burden, a particularly onerous one here. Moreover, it would be premature under these circumstances to decide the application or not, and if so, to what extent, of the established principle that the mixture of trust funds with those belonging to the trustee will impress a trust on the whole except so far as the trustee may be able to distinguish what is his own. See Eaton v. Husted, 141 Tex. 349, 172 S.W.2d 493 (1943); and Andrews v. Brown, 10 S.W.2d 707 (Tex.Com.App.1928); cited by respondents. We do point out, however, that petitioner does not claim the funds in question as his own but only that this is trust property of which he was an initial trustee charged with the duty of seeing that the money is used for the purposes for which it was donated and placed in his care.

The judgments below are reversed and the cause is remanded to the trial court for further proceedings in accordance with this opinion.

POPE, J., dissenting.

REAVLEY, J., not sitting.

POPE, Justice (dissenting).

I respectfully dissent, because the summary judgment proofs show (1) that Dr.

Clarence W. Lokey collected funds under the banner of the Methodist Church but did not report a large portion of those funds to his principal National Division, (2) that he used the money as settlor of the Lokey Trust, and (3) that the funds which Dr. Lokey says were restricted funds were commingled with National Division's funds. According to Dr. Lokey, the amounts of the restricted funds are now incapable of ascertainment. Dr. Lokey's own deposition testimony demonstrates the futility of a trial which has for its purpose an accounting to separate the admittedly commingled funds.

Dr. Lokey, according to his deposition admissions, was the agent of National Division. As such agent he owed fiduciary duties to his principal. See 1 Restatement (Second) of Agency § 13 (1958). As an agent, he had the duty to deal openly with and to make full disclosure to National Division, as well as to refrain from acquiring interests adverse to it. Kinzbach Tool Co., Inc. v. Corbett-Wallace Corporation, 138 Tex. 565, 160 S.W.2d 509 (1942). In addition, he had the duty to keep clear and accurate accounts. 2 A. Scott, The Law of Trusts § 172 (3d ed. 1967).

Prior to 1944, Dr. Lokey, a Methodist minister, served as District Superintendent for the Bryan District of the Texas Annual Conference. In the fall of that year, he was elected General Secretary of the Division of Home Missions, and he moved to New York City in that capacity. He moved back to Texas in the fall of 1949 to concentrate his efforts in the new mission work among Spanish people by serving as the Superintendent of the Spanish Speaking Missions for the Methodist Church. He continuously served as Superintendent from 1949 until his retirement on January 31, 1966. Although the title to one or more of the church agencies changed through the years, it is undisputed that the line of authority ran from the Board of Missions under which was the National Division followed by the Department of Spanish Speaking Missions.

National Division authorized Dr. Lokey to collect funds on its behalf and to make reports to it of all funds so collected for the Spanish Speaking Missions. His employment was full-time. National Division paid his salary, rent, travel and other expenses. He explained, "I was committed to enlist funds which people wanted to give specifically for particular things and see that they did the things that the giver wanted to do. That was the thing we were specifically authorized to do, and nothing beyond that." He said the Spanish work was new mission work for which he was the first director. He said, "[T]hey expected us to get out and enlist the interest of the people who lived in the neighborhood or in the jurisdiction . . ., and we were responsible for enlisting their interest, accepting their money and applying it as they had wanted." These funds, according to Dr. Lokey, were to be collected and sent to National Division; the money would then be returned with additional money needed in the work. The funds collected for National Division, according to Dr. Lokey, were used for full or supplementary payment of salaries of Spanish speaking preachers, the payment of rent or the purchase of facilities in which to conduct services and a number of other special demands arising out of the mission work.

Dr. Lokey collected and reported some funds to National Division; but, commencing at some uncertain time, he also collected funds for the same Spanish work which he did not report and which he kept in a private account known only to himself and Bishop A. Frank Smith. When asked if he received moneys that were not reported to any agency of the Methodist Church, Dr. Lokey answered, "That's right." When asked if only he and his secretary knew about the $100,000 fund, he answered, "The secretary didn't know anything about that either." He said that nobody knew of the unreported collections except Bishop Smith, "no Anglo, no Latin." He said, "[W]e

didn't feel that we were under any obligation to reveal to those folks what we were doing over and beyond what we were committed to do by the Division." Dr. Lokey explained how he arrived at his ideas about his powers to make collections for the same work and not report them. He said the National Division "sent me down here to create a new job which they didn't know anything about that had never existed before. They had to give us the right to proceed." This summary judgment proof shows conclusively that, while National Division authorized Dr. Lokey to make collections either in its name or in that of the Methodist Church, the Division expected him to report all such collections.

On January 4, 1963, Dr. Lokey wrote a $100,000 check payable to the Texas Methodist Foundation. He drew these funds from the account maintained at the Tyler Bank and Trust Company, Tyler, Texas, where National Division's funds were on deposit. He, as the sole settlor and by use of those church funds, established the Augustine Kern Lokey and Clarence Walters Lokey Trust. The Texas Methodist Foundation was named trustee for the purpose of investing the funds. He reserved to himself and two others the powers to make distribution of the funds from the Trust. On July 8, 1964, he wrote a check in the sum of $40,000 which was also payable to the Foundation. The last item was designated as "A" Trust, because Dr. Lokey orally instructed the Secretary of the Foundation not to include it within the Lokey Trust until it had been invested and grown to $50,000. The Foundation held the funds, but their status has been ambiguous.

Dr. Lokey justifies his withdrawing the $140,000 from the other National Division funds in two ways. (1) A number of donors made restricted gifts to him for such use as he might determine, and (2) Bishop A. Frank Smith authorized him to make the secret collection and to use it as Dr. Lokey thought best. According to Dr. Lokey, there were many people who "committed the money to me to carry out the things which we talked about, which was the strengthening of the Ministry of the Methodist Church to the Latin American People." Such an authorization is, in fact, a good expression of Dr. Lokey's duty to the National Division.

Dr. Lokey, though closely questioned, was unable to explain how he settled upon the sum of $140,000 as the amount of the restricted gifts. He could not recall the name of a single donor, the largest donor, the number of donors, the dates or amounts of the gifts, or the nature of the restrictions which the donors placed upon their gifts.

Dr. Lokey finds his other source of authority for creating the trust in Bishop A. Frank Smith. Bishop Smith was Chairman of the Board of Missions in 1944; he was the one who persuaded Dr. Lokey to assume the duties as Secretary for National Division, one of three divisions under the Board. Dr. Lokey produced two letters from Bishop Smith which show that the two of them maintained a separate private fund for church use. Dr. Lokey said, "The Division left it up to us to make a program and to work it out, and he, being the Chairman of the Division, whatever he wanted to do was accepted, and between the Bishop and myself was complete authority to operate and carry out the program . . . ." The Board of Missions governed the National Division, and Bishop Smith was the Chairman of the Board. My search of the Book of Discipline of the United Methodist Church does not show that the Chairman of the Board of Missions, acting alone, had the power to countermand the decisions either of the National Division or the Board of Missions.

This proof by Dr. Lokey shows that while he was employed to collect money for the Spanish Work of the Southwest and to deliver it to National Division, he collected funds for that work which he neither delivered nor reported to National Division. According to Dr. Lokey, Bishop Smith did not authorize the use of these funds in any

amount for funding the Lokey Trust because Bishop Smith knew nothing about such a plan. Bishop Smith died in October, 1962; the Lokey Trust was created in January, 1963. Dr. Lokey testified in his deposition that neither Bishop Smith nor anyone else ever instructed him to use the church money for funding a trust, or for investment, or for the establishment of a scholarship fund. No one authorized him to use the funds by creating a trust in his own name.

A more serious problem with the holding of the majority is its failure to recognize that Dr. Lokey commingled the so-called restricted funds with those of National Division. The rule when one mixes trust funds with his own is that the whole will be treated as trust property, except so far as the commingler is able to distinguish what is his own. Andrews v. Brown, 10 S.W.2d 707 (Tex.Com.App.1928). Dr. Lokey's commingling of the restricted funds with those of his principal imposed upon him the duty of strict accounting. Mooers v. Richardson Petroleum Co., 146 Tex. 174, 204 S.W.2d 606 (1947); 2 A. Scott, The Law of Trusts § 172 (3d ed. 1967).

Dr. Lokey's testimony shows that he kept the restricted funds in an account separate from the National Division funds until shortly after Bishop Smith's death. He said he had no records of that prior account and does not "know what the account was." After Bishop Smith's death, he began depositing the restricted funds with National Division's funds in the same account. All records of the restricted funds, the names of the donors, the amounts of their gifts, and the nature of the restrictions asserted by Dr. Lokey have been destroyed. They were destroyed in 1965, about two years after the funds were commingled and he withdrew the $140,000. Dr. Lokey was adamant in his testimony that, even with a dozen secretaries helping him, "there could be no possibility of reconstructing the records." Dr. Lokey could furnish no clue as to the reason $140,000 was selected as the amount of alleged restricted funds. From his testimony, not only is the record of the claimed restricted funds unknown, it is forever unknowable.

It might be thought that resort to the records of the Tyler Bank and Trust would supply the information needed to separate the restricted funds from National Division's money. Dr. Lokey's designation of certain funds as "restricted" came from oral instructions of the donors. The records are not now in existence and cannot be reconstructed. The bank copies of the cancelled checks for the period prior to 1964 do not reveal this information, and Dr. Lokey says that the information is now unavailable. According to Dr. Lokey, he is unable to uncommingle the funds, and there is no other living person who knew about the restricted funds.

I would affirm the summary judgment.