NO. 07-01-0343-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

MARCH 1, 2002

_____


IMA McADAMS, INDIVIDUALLY AND AS EXECUTRIX OF THE
ESTATE OF J.Y. McADAMS, DECEASED, APPELLANT

V.

J.Y. JR. (J.T.) McADAMS AND ANNIE McADAMS, APPELLEES


_____

FROM THE 69TH DISTRICT COURT OF HARTLEY COUNTY;

NO. 3739H; HONORABLE H. BRYAN POFF, JR., JUDGE

_____

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

Appellant Ima McAdams (Ima), individually and as independent executrix of the estate of J.Y. McAdams, deceased, brings this appeal from a judgment against her in a lawsuit brought by her son J.Y. Jr. McAdams (J.T.) or his wife Annie McAdams (Annie) for damages resulting from a breach of her fiduciary duty as executrix of the estate. Although

the parties are familiar with the somewhat complicated procedural and factual background, we will recite it in the detail necessary to a proper discussion of the issues presented for our decision.  For reasons we later express, we affirm the judgment of the trial court.

J.Y. McAdams died in 1974 survived by his wife Ima, and the couple's four children, J.T., Coretha Brown,[1] Barbara Billups (Barbara) and Margaret Ward.  He left a will in which Ima was appointed as independent executrix of his estate.  In his will, he stated that all of his property was community. He bequeathed his wife a life estate in his community one-half interest with remainder over to his children, share and share alike.  In pertinent part, the will also provided:

> The said Ima L. McAdams shall have the use, benefit, and enjoyment of said property during her natural life and shall also have the right and power to use or invade the body of my estate to whatever extent as may be necessary to provide for her welfare, support and maintenance in the manner to which she is accustomed.
>
> During the existence of my said wife's life estate she shall also have full power and authority to change the form of any or all of the corpus of my estate by sales, exchanges, encumbrances, investments, purchases or other despositions [sic] or acquisitions, to the extent deemed advisable by my said wife in her discretion, all without being liable for any loss incurred in her exercise of such discretion in good faith.  In connection with her exercise of any such powers, any other party dealing with her shall receive as good a title to anything transferred by my said wife as if my said wife had been the fee simple owner thereof, and such other party shall not be required to follow or inquire into the application or disposition of the consideration paid by such other party.  However, by proper accounting or otherwise, my said wife shall segregate or maintain the separate identity of the corpus of my estate, regardless of whether such corpus remains in its original form or is

---

[1]Coretha Brown is now deceased.

2

converted to some other form by her exercise of any of the powers hereinabove granted.

At trial, Ima testified that she never took any funds from the corpus of the estate to pay for her welfare, support, or maintenance.

In the underlying suit, J.T. and Annie originally sued Ima and Barbara concerning a dispute over a McAdams farm partnership and a claimed breach of fiduciary duty, fraud, and conspiracy with respect to Ima's administration of the estate. At trial, the court rendered a take-nothing judgment, which was appealed to this court. In the course of disposing of that appeal, we reversed and remanded that portion of the trial court judgment decreeing that J.T. take nothing on his claims against Ima and Barbara arising from the distribution of the estate of J.Y. McAdams. This appeal results from the retrial of that portion of the suit.

In the judgment giving rise to this appeal, the trial court held that J.T. should recover damages based upon a fraudulent inducement to sign a release of claims arising from the distribution of the estate. It held that J.T. was entitled to recover damages of $235,083 as his 25% share of the $940,332 the court found resulted from a diversion of funds by Ima from the corpus of the estate. The trial court further decreed that J.T. take nothing against Barbara, that Ima be removed as executrix of the estate, and awarded attorney fees and prejudgment interest. The trial court entered findings of fact and conclusions of law in support of its judgment.

At issue are several transactions that occurred during the administration of the estate.[2] These include 1) a loan of $501,000 made to J.T. by the estate and Ima, 2) a sale of some property by the estate to Barbara for $47,000, 3) the purchase of the Keyes Farm in Oklahoma by Ima, J.T., and Annie, with the estate contributing part of the money for the purchase, and the subsequent sale of the same property, and 4) a loan given by the estate for the purchase of an elevator on the Bohlender property. After those transactions, Ima offered to make a cash distribution to the remaindermen in exchange for a release of all claims or liabilities against her. In doing so, she represented the value of the corpus of the estate to be $471,513.19, and J.T. subsequently received $117,878.29, which was one-fourth of the $471,513.19 figure. When he filed his suit, J.T. averred that the corpus of the estate was actually much greater than that amount.

In pursuing her appeal, Ima presents 12 issues for our decision. In the first eight of her issues, she challenges the legal and factual sufficiency of the trial court's findings that 1) $84,000 was diverted from the proceeds of a $501,000 loan made by the estate to J.T. and Annie, 2) $60,000 was diverted from the proceeds of a Bohlender elevator note, 3) $623,333 was diverted from the repayment of the loans made to obtain the Keyes Farm, and 4) $172,990 in lost profits to the estate occurred as a result of the sale of the Keyes Farm. In her four remaining issues, Ima asks if 9) by electing to confirm the release, conveyance, and consent to distribution, J.T. has waived his standing to seek Ima's removal as executrix of the estate, 10) J.T. is entitled to keep the funds paid him under the

---

[2]Nothing in the record indicates the estate has been closed.

4

conveyance, release, and consent to distribution and at the same time rescind the agreement, 11) the award of attorney fees is mandatory, and 12) she, Ima, is entitled to a $25,000 offset to the judgment together with interest as the result of another judgment she had recovered against J.T. and Annie.

As cross-appellant, J.T. asks if 1) the record conclusively shows that Ima caused damage to the estate of J.Y. McAdams in excess of the damages found by the court in its judgment with respect to the diversion of proceeds, or 2) alternatively, whether the trial court's finding as to the amount of those damages is against the great weight of the evidence, 3) the trial court improperly failed to award damages against Barbara for conspiracy in the sale of land to her because the record conclusively demonstrates otherwise or because the trial court's finding otherwise is against the great weight of the evidence, 4) the trial court improperly calculated the amount of prejudgment interest, 5) the trial court abused its discretion in failing to award the entire amount of attorney's fees proved at trial, and 6) the trial court abused its discretion in failing to award exemplary damages.

In reviewing a no-evidence issue, we consider the evidence and reasonable inferences from that evidence which, viewed in their most favorable light, support the trial court findings, disregarding all evidence and inferences to the contrary. *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990). If more than a scintilla of evidence supports the finding, the no-evidence challenge fails. *Id.* In reviewing a factual insufficiency

challenge, we review all the evidence and reverse only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). The trier of fact is the sole judge of the credibility and the weight to be given to the testimony of the witnesses. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). Because both parties question the sufficiency of the evidence to support the trial court's award of damages with respect to the specific transactions enumerated, we will address each of those transactions separately.

In Ima's first two issues, the subject transaction is a $501,000 loan made in 1988 to effect a bankruptcy settlement. In its findings of fact with regard to this loan, the trial court found "Ima diverted to her own use and benefit $84,000.00 by taking the funds repaid to the Estate." Ima denies there was any diversion of this money, while J.T. claims that the entire amount was diverted.

J.T. and Annie executed a $501,000 note to Ima as executrix, which was secured by a deed of trust on land in Dallam County. The note was eventually paid and the deed of trust released on December 14, 1995. With regard to the diversion, J.T. points to Ima's testimony that at the time she calculated the corpus of the estate prior to distribution, she did not include as an asset any credit for the $501,000 note balance. The history of payments made on the note is confusing. Ima also testified that at the time of this loan, she did not have $501,000 in the estate, so she borrowed some money on certificates of

6

deposit owned by the estate. Later, $430,000 (apparently the proceeds of the sale of some cattle by J.T.) was wire transferred to Ima's personal account. Both Ima and J.T. denied giving instructions that this money be wired to Ima's personal account. With the money, Ima averred that she bought certificates of deposit totaling $350,000 in the name of the estate, and the remainder of $80,000 she applied to a $275,000 debt J.T. owed her personally. J.T. also gave Ima a check for $100,000 made out to her individually, which, she said, was applied to the estate corpus.

However, Jordan Mills, an accountant who testified for J.T., reviewed the bank records and ledger accounts kept by Ima, and averred that out of payments made on the $501,000 note, he could only find that $100,000 was paid to the estate. He also said that although the note called for 9% interest, he was never able to compute exactly what interest may have been paid on the note.

Thus, the evidence is disputed as to how much of the $501,000 loan was actually repaid to the estate. From the record, we are unable to tell exactly how the trial court arrived at the figure of $84,000 as the amount of the repayments Ima diverted, and neither party has offered an explanation of that computation. Even so, that amount is within the variation of the disputed testimony at trial. There is also the evidence that Ima took $80,000 from the funds repaid by J.T. and credited it to a personal loan made by her to J.T. Considering this with the other evidence, the trial court could have rationally arrived at the $84,000 figure.

Nevertheless, J.T. contends the amount of money actually repaid to the estate is irrelevant because it is undisputed that Ima did not include the proceeds of the $501,000 note in the corpus of the estate used to compute the distribution. However, there was testimony that the estate did not have $501,000 at the time the loan was made and that Ima borrowed the money, using as collateral certificates of deposit owned by the estate. Thus, if that testimony was accepted by the factfinder, it supports an inference that the $501,000 was not originally in the corpus of the estate but was borrowed, was then eventually paid back to the lender, and therefore should not have been included in the corpus as J.T. contends. Ima's first two issues are overruled.

In considering Ima's third and fourth issues, we must consider whether the trial court was incorrect in awarding $60,000 in damages for funds diverted from the Bohlender elevator note proceeds. Parenthetically, J.T. does not challenge this award. In 1985, the estate and Ima loaned $60,000 each to the Bohlenders to build a grain elevator on land purchased from the estate. To secure that amount, the Bohlenders executed a note in that amount secured by a deed of trust. The note was repaid and Ima testified that although she did not give a special credit for the estate's $60,000 in calculating the estate's value, it was already included in the corpus of the estate.

Ima also testified that when she received repayments on money the estate had loaned, she deposited both principal and interest into the same bank account, although she attempted to keep separate records herself as to what constituted principal and

8

interest. There were no estate records per se to show whether repayments of money it loaned was corpus of the estate or was interest. At trial, the court found that Ima had diverted to her own use $60,000 that belonged to the estate.

J.T. argues that it was Ima's burden to show that the estate's money was returned to the estate because she had admitted that she commingled her individual and estate funds. Ima argues there was no proof that she improperly retained the estate's money and the trial court erred in finding to the contrary. In that connection, viewed in the light by which we must view it, the evidence is both legally and factually sufficient to support the trial court's resolution of this question. In that regard, the evidence clearly shows that contrary to the instructions in the will, with respect to money loaned by the estate, Ima commingled the interest and corpus of repayments made on the loan. Although Ima asserts that the $60,000 was included in the corpus of the estate for distribution, the record does not show she was able to trace those repayments to show their inclusion in that corpus. *See Eaton v. Husted*, 141 Tex. 349, 172 S.W.2d 493, 498-99 (1943). Ima's third and fourth issues are overruled.

In determining Ima's fifth and sixth issues, we must examine the purchase of the Keyes Farm. With respect to that transaction, the trial court found that Ima had diverted to her use and benefit $623,333 that belonged to the estate. In 1989, J.T. and Ima purchased a farm near Keyes, Oklahoma, for $1,100,000. Although J.T. and Annie received a 2/3 interest in the farm with Ima receiving the other 1/3 interest, all of the money

9

came from Ima and the estate. To finance the purchase, ostensibly J.T. borrowed $366,666.66 from the estate and the same amount from Ima individually. However, Ima's ledger sheets show, and she admitted, that the estate actually contributed 85%, or $623,333.05 of the money loaned to J.T. Ima did not say whether the remainder of the money advanced came from estate funds or her separate funds. She admitted that if the money was repaid, the estate corpus would receive only $366,666.66, which was less than actually came from estate funds. Ima admitted that she did not give any credit for the estate's contribution to the purchase price when she calculated the amount for distribution of the estate.

Ima testified that although J.T. paid some interest on the notes executed by him, no principal was ever paid. The farm was sold in 1994 for approximately $2,000,000. Of the profit, two-thirds went to J.T. and one-third to Ima. The loans against the property were paid off at the time of the sale. Both Ima and J.T. directed the title company in writing to distribute the remainder of the sale proceeds after the liens were paid, with $594,473 going to J.T. and Annie and $663,904.02 going to Ima. Of the approximately $1,397,000 that she received from the sale, including the repayment of the loans and the portion of the remainder paid to her, Ima did not return any of those funds to the estate, but placed them in a certificate of deposit in her own name. The evidence is therefore both legally and factually sufficient to support the trial court's finding that she diverted $623,333 from the estate. Ima's fifth and sixth issues are overruled.

10

We note J.T.'s first cross-issue contention that the evidence actually supports an award to him of $920,318.64 with respect to the loans made in connection with the purchase of the Keyes Farm. This is so, he argues, because the evidence is uncontroverted that the estate contributed more than $623,333 to its purchase. Jordan Mills testified that Ima kept a lot of the estate money in certificates of deposit in the estate's name. In trying to determine where the money for the purchase of the farm came from, Mills looked at bank statements, checks, and deposit slips. He claimed to have been able to trace the amount of estate money used to purchase the farm to an amount of $920,318.04 based on a ledger sheet used by Ima showing various bank deposits which were gathered to make up the purchase price of the farm. Further, because the total price was $1,101,476 and $920,318.64 is 83.55% of that amount and, because he saw some margin notations on Ima's balance sheets showing 85% attributable to the estate and 15% attributable to J.T., Mills believed his figure was correct.

Thus, there was conflicting testimony from Ima and Mills as to the amount of funds contributed by the estate to the purchase of the Keyes Farm with Ima testifying that the estate only contributed 85% of the money loaned to J.T. while he contends, supported by Mills's testimony, the correct amount was 85% of the total purchase price. Because it was within the trial court's special prerogative as the trier of fact to resolve factual disputes, we will not disturb the trial court finding. Ima's seventh issue is overruled.

The $172,999 included in the trial court's findings as the estate's lost profit on the Keyes Farm transaction is the subject of Ima's seventh and eighth issues. While she contends the evidence does not support that inclusion, J.T. contends the amount of profit attributable to the estate was actually $297,236.78. The parties agree that the farm was purchased for $1,100,000 and sold for $2,000,000. Therefore, the profit on the sale was approximately $900,000. The parties also agree that Ima was entitled to one-third of the profit or approximately $300,000. If the estate contributed $623,333.05 to the purchase price of the farm, as the trial court apparently found, that contribution amounted to about 57% of the purchase price. The same percentage of Ima's share of the profit is approximately $171,000. Although that figure is not the exact amount of the lost profit found by the court, it is sufficiently close to sustain the trial court's findings. Additionally, as we have noted, Ima admitted she had deposited all the proceeds from the sale received by her into a certificate of deposit in her name. Ima's seventh and eighth issues are overruled.

In her ninth issue, Ima argues that by electing to confirm the release, conveyance and consent to distribution, J.T. waived any right to seek her removal as executrix of the estate. She bases that position on the argument that once J.T. elected to take his share of the distribution, he had no further interest in the estate and therefore had no standing to challenge Ima's position as the independent executrix of the estate. In response, J.T. contends that, although the argument might have had merit if the estate had been worth

12

what Ima represented, because the trial court found it was worth much more than she had represented, he has not waived his right to seek her removal.

The trial court found as a matter of fact that Ima misapplied and converted estate property, failed to make a full disclosure, misrepresented the value of the estate, and failed to account, all of which constituted gross misconduct and gross mismanagement in the performance of her duties, which constituted cause for her removal. Thus, the trial court concluded, Ima had breached her fiduciary duty and should be removed as executrix. The trial court further concluded that J.T. was not barred "from seeking relief despite not actually returning consideration received under the release because he satisfied his 'tender' obligation, and because he has a meritorious claim for compensation in excess of that consideration."

The existence of standing is a question of law. *A & W Industries, Inc. v. Day*, 977 S.W.2d 738, 741 (Tex.App.--Fort Worth 1998, no pet.). For a person to maintain a suit, he must have standing to litigate the matters at issue. Generally, that means some interest peculiar to him individually and not as a member of the general public. *Id.* Ima does not contest that J.T. would have had standing to seek her removal but, as we noted above, she argues that he has waived that right. The essence of the trial court findings was that Ima misrepresented the value of the estate, she intended J.T. to rely on her representations, he did to his detriment, and that he was entitled to damages above the amount of money he originally obtained and for which he executed his release. The trial court's findings are

13

sufficiently supported by the record. Because of these findings, J.T. has not waived his right to seek Ima's removal, even though he never rescinded his release. Damages and rescission are not mutually exclusive remedies when both are needed to give complete relief to the complaining party. *See LaChalet International, Inc. v. Nowik*, 787 S.W.2d 101, 104 (Tex.App.--Dallas 1990, no writ). The record does not show that the estate administration has ever been officially closed. That being so, in order to accord J.T. complete relief, it was proper both to remove Ima as executrix and to allow J.T. to recover his share of the additional value of the estate above that which he had already received. Ima's ninth issue is overruled.

Much of our discussion above is applicable to Ima's tenth issue, in which she asserts that because J.T. elected to waive rescission of his previous release agreement, he is bound by the sums he received under that agreement and is not entitled to receive anything above what he has already received. However, as we have stated, a party is not necessarily required to choose between rescission and damages when a party has been fraudulently induced to enter into a contract. Further, as we noted in our previous opinion on this matter, before J.T.'s acceptance of a benefit can create an estoppel, it must be shown that the benefit was accepted with knowledge of all material facts. *Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex. 1971). Additionally, J.T. had agreed to accept a one-fourth distribution of the estate. Even if that agreement was not rescinded, it does not mean that he would not be entitled to receive a one-quarter distribution based on the true value of the estate as opposed to the represented value. Ima's tenth issue is overruled.

14

In her eleventh issue, Ima posits that J.T. is not entitled to receive attorney's fees because there is no evidence that presentment of his claim was made as required by section 38.002 of the Civil Practice and Remedies Code, and a party may not recover attorney's fees for rescission of a contract. In responding, J.T. argues that he not only sought recovery of attorney's fees under section 38.001 of the Civil Practice and Remedies Code, but he also sought recovery of those fees under the Property Code and the Declaratory Judgments Act (section 37.009 of the Civil Practice and Remedies Code). Those rights of recovery, he posits, have not been challenged by Ima. In any event, he contends, there is sufficient evidence of presentment made in his attorney's affidavit on the subject of fees.

Under section 38.001 of the Civil Practice and Remedies Code, a person may recover reasonable attorney's fees if the claim is on an oral or written contract. Tex. Civ. Prac & Rem. Code Ann. § 38.001 (Vernon 1997). To recover under that section, the claimant must present the claim to the opposing party and payment for the just amount owed must not have been tendered by the opposing party before expiration of the 30th day after presentation of the claim. *Id.* § 38.002. While it is true that the filing of suit, in and of itself, does not constitute the requisite presentment, *Panizo v. Young Men's Christian Ass'n of Greater Houston Area*, 938 S.W.2d 163, 168 (Tex.App.--Houston [1st Dist.] 1996, no writ), a presentment of a claim is timely even if made after suit is filed, if it is made at least 30 days before trial. *K.C. Roofing Co., Inc. v. Abundis*, 940 S.W.2d 375, 379 (Tex. App.--San Antonio 1997, writ denied).

15

Attached to J.T.'s attorney's affidavit is a copy of a letter dated August 20, 1998, in which J.T.'s claim is presented. While the court has discretion as to the amount of attorney's fees, their award is mandatory if the requirements are met. *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 23 (Tex.App.--Tyler 2000, pet. denied). Additionally, attorney's fees have been awarded based on fraud arising from a breach of contract. *See Gill Sav. Ass'n v. Chair King, Inc.*, 797 S.W.2d 31, 31-32 (Tex. 1990); *Schindler v. Austwell Farmers Co-op*, 829 S.W.2d 283, 288 (Tex.App.--Corpus Christi), *aff'd on other grounds*, 841 S.W.2d 853 (Tex. 1992). Ima's eleventh issue is overruled.

In her twelfth and final issue, Ima claims she is entitled to a $25,000 offset against the judgment for the amount of the attorney's fees she was awarded against J.T. in the prior trial of this cause. She also claims an offset for $117,878.29, the amount she had already distributed to J.T., together with 10% interest per annum from the date of the distribution. We note that the trial court has only entered judgment for the additional sums that should have been included in the value of the estate. Thus, the court has not awarded J.T. any double recovery in that regard.

With regard to the offset for the $25,000 attorney fees, J.T. argues that because Ima did not request such an offset from the trial court, she has waived the right to make that claim on appeal. Ima neither cites any authority that she is now entitled to such an offset, nor does she point out in the record where she made such a request. However, in making our own review of the record, we find that she did make such a request, in addition

16

to other requested offsets, in her first supplemental answer. However, Ima does not cite any portions of the record in which she called that particular request to the attention of the trial court. Our perusal of the record reveals that the only portions of the prior judgment Ima asked the trial court to take judicial notice of was with respect to two tractors and a plow, for which she was asking compensation. Also, she did not raise that question in her motion for new trial. To preserve a complaint for appellate review, the record must show it was made to the trial court by a timely request, objection, or motion that stated with sufficient specificity the grounds for the ruling sought so that the trial court might be made aware of the complaint. Tex. R. App. P. 33.1(a)(1)(A). By failing to meet that requirement, Ima has failed to preserve that complaint for our review. Ima's twelfth issue is overruled.

We have already addressed the basis for J.T.'s first cross-issue with respect to the legal and factual sufficiency of the evidence supporting the trial court's awards with regard to the $501,000 loan, the Keyes Farm transaction, and the Bohlender elevator note in discussing Ima's contentions in that regard. We will not, therefore, address those matters again. However, because we have not addressed the legal and factual sufficiency of the evidence with regard to the Billups land transaction, and because it is raised by J.T. in that issue, we will discuss that question.

In reviewing a legal sufficiency challenge on an issue upon which the complaining party had the burden of proof, we examine the record to determine if there is any evidence to support the finding while ignoring all evidence to the contrary and, if there is no

17

evidence to support the finding, we must see if the contrary proposition had been established as a matter of law.  *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982).  As already stated, a factual sufficiency challenge requires us to review the record for some probative evidence to support the finding and determine if, in light of all the evidence, the finding is not manifestly unjust.  *Traylor v. Goulding*, 497 S.W.2d 944, 945 (Tex. 1973).

On February 17, 1993, Ima sold her daughter Barbara the estate's undivided one-half interest in the east one-half of Section 77 and all of Section 78, Block 2, Brooks & Burleson Survey*,* in Hartley County.  Barbara executed a $47,000 note payable to Ima as the executrix of the estate, which was secured by a deed of trust on the property.  On November 30, 1995, Ima, as executrix, transferred the note and the liens securing it to herself.  She then released the note and liens on October 29, 1996.  In advancing his challenge, J.T. contends that no payment was made to the estate for this transfer and, because of this, the value of the estate prior to the distribution should have been increased by that amount.  The trial court did not make any award with respect to this transaction.

Ima testified that she could not produce a check for a $47,000 payment from her to the estate or a deposit slip showing a deposit of any such amount to the estate.  She also admitted that Barbara paid her individually the $47,000 and that she deposited the money in her individual account.  She further admitted that in calculating the value of the estate prior to her distribution, she did not add a separate credit for the $47,000, but that that amount was already included in her computation of the corpus of the estate.  At the time

18

the estate was distributed in 1996, she had not yet been paid by Barbara. Therefore, she averred, she had put her own money in the estate and, when Barbara paid her after Barbara had received her share of the distribution, she was entitled to put the money in her own individual account. The trial court, in its capacity as factfinder, was entitled to accept Ima's testimony and, if accepted, as it obviously was, it is both legally and factually sufficient to uphold the trial court's refusal to award damages in that respect.

J.T. also contends that he should have been awarded $28,000 of the profit resulting from the sale of the estate's undivided one-half interest in the land to Barbara. His argument is based on the proposition that Ima sold the land to Barbara for less than its fair market value. The 960 acres was included in the inventory of the estate property at a value of $100 per acre or a total of $96,000. Both Barbara and Ima said the undivided interest in the land was sold to Barbara for $100 per acre based on its inventory value in 1974. No current appraisal of the land was made at the time of its sale, but neighboring land sold at $150 per acre.

Both parties presented expert testimony about the value of the land. Steve Rogers, a real estate appraiser, was called by J.T. Rogers testified that based on information he had gathered about comparable land sales, he estimated the value of the land on February 17, 1995, at $185 per acre. To arrive at the value of the undivided one-half interest, he applied a discount factor of 15% to 20% because a half interest is not marketed easily. By his calculations, the interest in the land would have been worth $75,000 at the time of

19

its sale. However, he admitted he had never actually been on the land and had only seen it from the road. He initially had not used the neighboring land, which had sold in his calculations, but later went back and took it into consideration. However, he did not change his opinion because he felt the sale of the land was supportive of his valuation, even though it sold for substantially less than other properties he had used.

Appraiser Leslie Dodson testified for Ima. He also used the sale comparison approach in arriving at his valuation of the land in 1995. He valued the estate's one-half interest at $47,500 based on a value of $150 per acre with a 33 1/3% discount factor. He averred he had used this formula before and it was an accepted method. He had actually been on the land and said it was important to do so in order to know about potential water production on the property and its topography. Even though it was substantially similar, he admitted he valued the land across the road at $168 per acre.

Again, the trial court had conflicting appraisals before it. As the factfinder, it was well within its power to judge the credibility of the experts and the evidentiary weight to be given their opinion. We cannot fault its resolution of the conflict and find no error in its refusal to award the damages suggested by J.T. The first two cross-issues of J.T. are overruled.

In his third cross-issue, J.T. contests the trial court's refusal to award him damages against Barbara for conspiracy in regard to the Billups land transaction because, he reasons, the record conclusively establishes such a conspiracy or, in the alternative, the

20

trial court's refusal to find such a conspiracy was against the great weight of the evidence. J.T. argues that the evidence shows Ima and Barbara acted together to transfer the estate's interest in the land for less than its fair market value and to divert money away from the estate, and that they failed to disclose those facts to him. Because of their actions, he reasons, Ima and Barbara are jointly and severally liable for the value of the land which they diverted from the estate.

The essential elements of a conspiracy are 1) two or more persons, 2) an object to be accomplished, 3) a meeting of minds on the object or course of action, 4) one or more unlawful, overt acts, and 5) damages as the proximate result. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). Ima denied that she ever talked to Barbara about attempting to defeat the estate's interest in the land. Further, she did not remember whether Barbara objected to the $47,000 sale price, and she had no conversation with Barbara other than to tell her she would sell her the land.

Barbara averred that she was told the purchase price for the property would be $47,000, she did not seek an appraisal of the property and, she admitted, she did not tell J.T. about the purchase of the property. Although in her earlier testimony Barbara stated she had known the property across the road sold for $150 per acre at the time she made the purchase, at this trial, she denied that was the case. Barbara also admitted that she did not make a down payment on the land and that she never made any payments on the land to the estate. Barbara additionally said that Ima told her the estate would be

21

distributed and Barbara could give a check in payment of the purchase loan at that time. Ima had also told her that she, Ima, was going to buy the note from the estate. Barbara averred that she and her sister Margaret prepared a summary of the estate banking transactions after J.T.'s lawsuit was filed. She did not remember what amounts she saw recorded in that summary, but in her prior testimony, she had agreed that she did not see the $47,000 payment recorded.

After reviewing the evidence, we conclude that J.T. has failed to conclusively establish that Ima and Barbara entered into a conspiracy and the trial court's failure to find such a conspiracy was not against the great weight of the evidence. The testimony in the record shows that Ima told Barbara the estate would sell her the property and what the price would be. The fact that Barbara did not challenge the sale price and, even though she may have known nearby land sold for more money, that she did not have an independent appraisal made is not necessarily evidence that she conspired to defraud the estate. The evidence also showed that Barbara did not know until after J.T.'s lawsuit was filed that the estate might not have received any money for the land. The resolution of inconsistencies in the evidence was within the trial court's power as the factfinder to resolve, and we do not find it reversibly erred in declining to award conspiracy damages against Barbara. J.T.'s third cross-issue is overruled.

In his fourth cross-issue, J.T. challenges the amount of prejudgment interest awarded him. The gist of his complaint is that the interest awarded was based on the time

period from November 16, 1996, to April 6, 2001, even though the judgment was not signed until May 25, 2001. That being so, J.T. claims his entitlement to additional interest for the period from April 6, 2001, to May 25, 2001. Although the record shows that J.T. filed a motion to modify the judgment to correct the amount of interest awarded, there is nothing in the record showing the trial court ever ruled on it. Ima does not contest that J.T. would ordinarily be entitled to prejudgment interest to the date of judgment but, she claims, J.T. is not entitled to any additional prejudgment interest because he drafted the judgment, including the calculation of prejudgment interest. Thus, he got what he requested, she asserts.

The judgment itself recites that the plaintiff is awarded 6% prejudgment interest from November 16, 1996, "to the date of this Judgment, in the amount of $38.64378 per day." The judgment further states, "[a]s of the date of this Judgment, the total prejudgment interest is $61,907.34 . . . ." When a party moves for judgment and judgment is entered in accordance with the motion, the party waives the right to complain of the judgment on appeal. *Casu v. Marathon Refining Co.*, 896 S.W.2d 388, 389 (Tex.App.--Houston [1st Dist.] 1995, writ denied). On the other hand, when a party merely submits a draft judgment to conform with what the court announced would be its judgment, the party does not waive his right to complain on appeal. *In re Bahn*, 13 S.W.3d 865, 875 (Tex.App.--Fort Worth 2000, no pet.); *John Masek Corp. v. Davis*, 848 S.W.2d 170, 175 (Tex.App.--Houston [1st Dist.] 1992, writ denied).

23

In this case, the record reveals that at the end of trial, the court announced it was of the belief that the estate was short of money owed to it, but did not announce any specific award of damages at that time. The court also did not address prejudgment interest. If the court did make such an announcement at a later time or if it notified the parties of its decision by letter, it does not appear in the record. There is also no motion for judgment in the record. Therefore, based on the record before us, the written judgment was the court's first rendition with respect to prejudgment interest. The error, then, was judicial rather than clerical. *See Comet Aluminum Co. v. Dibrell,* 450 S.W.2d 56, 59 (Tex. 1970)*.*

The judgment was prepared by J.T. and the court entered the judgment draft submitted by him. Although J.T. could not have known the date the judge would sign the judgment, he chose to draft it so as to specify the amount of interest awarded. Thus, J.T. received what he requested and has waived his right to complain on appeal. J.T.'s fourth cross-issue is overruled.

In his fifth cross-issue, J.T. complains that the trial court should have awarded him the entire amount of attorney's fees he proved at trial. In its judgment, the trial court awarded $98,000 in attorney's fees through trial on the merits, an additional $10,000 if the judgment was successfully defended in the court of appeals, and another $10,000 if it was successfully defended in the state supreme court. J.T.'s attorney filed an affidavit in which he requested $147,043.27 in attorney's fees through trial, with $20,000 for a successful

24

appeal to the court of appeals and an additional $10,000 for a successful appeal to the Texas Supreme Court.

As we noted above, J.T.'s request for attorney's fees is pursuant to section 114.064 of the Property Code, and sections 37.009 and 38.001 of the Civil Practice and Remedies Code. The relevant portion of the Property Code relates to instances in which a trustee may recover certain expenses for activities on its behalf. In relevant part, the section states, "the court may make such award of costs and reasonable and necessary attorney's fees as may seem equitable and just." Tex. Prop. Code Ann. § 114.064 (Vernon 1995). Similarly, section 37.009 of the Civil Practice and Remedies Code provides that in any proceeding under the Declaratory Judgments Act, "the court may award costs and reasonable and necessary attorney fees as are equitable and just." Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (Vernon 1997). J.T. agrees that the award of attorney's fees lies within the trial court's discretion. We have previously noted that while an award of attorney's fees pursuant to section 38.001 of the Civil Practice and Remedies Code is mandatory if the necessary requirements are met, the amount of those fees to be awarded is discretionary.

Therefore, under any of the statutes relied on by J.T., the amount of attorney's fees awarded is reviewed under an abuse of discretion standard. In reviewing an award of attorney's fees, we must consider 1) the time and labor required, the novelty of the questions presented, and the skill required to perform the legal services; 2) the likelihood

25

that the acceptance of the employment precluded other employment by the lawyer; 3) the fee customarily charged in the locality for similar legal services; 4) the amount involved and the results obtained; 5) the time limitations imposed by the client or by the circumstances; 6) the nature and length of the professional relationship with the client; 7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and 8) whether the fee is fixed or contingent on results obtained. *Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc.,* 48 S.W.3d 225, 240-41 (Tex.App.--San Antonio 2001, pet. denied).

In the judgment, J.T. was awarded $296,990.34 and he seeks to recover almost half that amount in attorney's fees. There were two trials of this case and a prior appeal, the attorney's fees for which, J.T. argues, cannot be segregated. However, J.T. was unsuccessful in a portion of the first trial which did become a final judgment. Moreover, based on the number of times the testimony of witnesses was compared with their testimony in the first trial, J.T.'s attorneys were able to use testimony from the first trial with which they were familiar. Considering all the factors we are required to consider, along with the questions involved, the skill required, and the customary charges in the area, we find no abuse of discretion in the trial court's attorney's fees award. J.T.'s fifth cross-issue is overruled.

In his sixth cross-issue, J.T. posits that the trial court erred in failing to award exemplary damages. He reasons the evidence conclusively shows that Ima willfully

26

breached her fiduciary duties and intentionally misrepresented material facts regarding the assets of the estate and their value. He also argues that Barbara participated in those activities. We have already held that the trial court did not err in failing to award actual damages against Barbara, and there is no need to discuss exemplary damages as to her.

The Civil Practice and Remedies Code provides for the award of exemplary damages:

> (A) . . .[E]xemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from:
>
> > (1) fraud;
> >
> > (2) malice; or
> >
> > (3) wilful act or omission or gross neglect in wrongful death actions brought by or on behalf of a surviving spouse or heirs of the decedent's body, under a statute enacted pursuant to Section 26, Article XVI, Texas Constitution. . . .

Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (Vernon 1997).

The trial court stated in its findings of fact that Ima misrepresented the value of the estate to J.T., she intended J.T. to rely on her misrepresentations about the value of the estate, he actually relied on her misrepresentations, he did not have actual knowledge of the true value of the estate, and he suffered damages proximately caused by those misrepresentations. The trial court further found that Ima's actions in misapplying and converting estate property, failure to make full disclosure, her misrepresentations about

27

the value of the estate, and her failure to account constituted gross misconduct and gross mismanagement in the performance of her duties as executrix. Thus, assuming the evidence was sufficient to support those findings, the trial court could have awarded exemplary damages. The question, then, becomes whether the trial court was required to award exemplary damages in this situation.

The statute itself does not state that exemplary damages must be awarded if fraud or malice is found, and J.T. has cited no authority that states that proposition. Punitive damages are only proper in exceptional cases. *C & D Robotics, Inc. v. Mann*, 47 S.W.3d 194, 201 (Tex.App.--Texarkana 2001, no pet.). The factfinder may assess punitive damages to deter future misconduct, punish wrongdoers, and reimburse the plaintiff for remote losses. *Browning-Ferris Industries, Inc. v. Lieck*, 845 S.W.2d 926, 946 (Tex.App.--Corpus Christi 1992), *rev'd on other grounds*, 881 S.W.2d 288 (Tex. 1994). The wrongdoer in this instance is an elderly woman, which, as the trial court noted, by her own admission is no longer able to fulfill the role of executrix of the estate, at least in part, because of failing eyesight. The will also gave Ima the right to use the corpus for her own welfare, support, and maintenance in the manner to which she was accustomed. She never used that option. Additionally, there was evidence that Ima and J.T. had long had dealings with one another, including J.T.'s requests for loans from the estate to resolve his own bankruptcy problems, and some of those dealings had resulted in litigation by J.T. in which no liability on Ima's part was determined. In view of all of this, the trial court could have determined there was no need to assess exemplary damages to deter future

28

misconduct inasmuch as Ima would no longer be in a position to commit those same acts. It could also have determined that J.T. had not suffered any remote losses.  J.T.'s sixth cross-issue is overruled.

In summary, because we have found no reversible error, all issues presented by both parties are overruled, and the judgment of the trial court is affirmed.

John T. Boyd
Chief Justice

Do not publish.

Johnson, J., concurs.

NO. 07-01-0343-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

MARCH 1, 2002

_____

IMA McADAMS, INDIVIDUALLY AND AS EXECUTRIX OF THE
ESTATE OF J.Y. McADAMS, DECEASED, APPELLANT

V.

J.Y. JR. (J.T.) McADAMS AND ANNIE McADAMS, APPELLEES

_____

FROM THE 69TH DISTRICT COURT OF HARTLEY COUNTY;

NO. 3739H; HONORABLE H. BRYAN POFF, JR., JUDGE

_____

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

I concur with the results reached by the majority as to Ima's ninth issue and J.T.'s fourth cross-issue. Otherwise, I join the majority opinion.

Phil Johnson
Justice

Do not publish.